T.C. Memo. 2007-92

UNITED STATES TAX COURT

TRACEY L. TOPPING, Petitioner $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 22589-04.                    Filed April 17, 2007.

<u>David D. Aughtry</u> and <u>Hale E. Sheppard</u>, for petitioner.

<u>Travis T. Vance III</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  Respondent determined the following

deficiencies in petitioner's Federal income tax:

| Year | Deficiency |
|------|------------|
| 1999 | $47,425 |
| 2000 | 91,967 |
| 2001 | 112,070 |

After concessions,[1] the issues for decision are: (1) Whether petitioner conducts her equestrian and related activities as part of her design business; (2) whether these activities are for profit under section 183(a);[2] and (3) if the activities are for profit, whether the expenses associated with the equestrian activity are ordinary and necessary expenses under section 162(a). We hold that: (1) Petitioner conducts her equestrian and related activities as part of her design business; (2) petitioner's design and equestrian activities are conducted for profit; and (3) the equestrian-related expenses associated with her activity are ordinary and necessary expenses.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Petitioner resided in Wellington, Florida, at the time of filing the petition.

In 1998, petitioner was 46 years old and in the middle of a bitter divorce. She had no means of supporting herself. Petitioner held no job, had no college degree, and had not had

---

[1]Petitioner concedes that she is not entitled to claim Schedule C, Profit or Loss From Business, expenses amounting to $26,158 and $7,402 for her interior design activity in 1999 and 2000, respectively.

[2]All section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

any full-time employment for the past 25 years. Her significant assets consisted of a 16-year-old horse and a debt-encumbered condo in Wellington, Florida.

Forced to make a living to support herself, petitioner developed a plan to use her prominence in the equestrian world to build a business designing horse barns and homes. Her plan was to establish and maintain herself as a peer worthy of trust among the exceptionally wealthy families who participate in the upper realms of the equestrian circuit, own multiple residences, and use interior designers. Even though she had no written business plan, she discussed her plan for her business venture with her certified public accountant, Jeffrey Borofsky (C.P.A. Borofsky). She also discussed her plan with a longtime friend who had successfully started her own business. Petitioner did not conduct a formal market study, nor did she prepare any cashflow projections in anticipation of starting her new business. She did not have any experience in design other than taking a few design courses in college. However, petitioner possessed the artistic ability to draft structural designs freehand. Petitioner also was an experienced equestrian, having ridden horses and competed on an amateur level since she was 12 or 13 years old.

In 1999, petitioner formed a limited liability company, Topping White Design, L.L.C. (Topping White), in Florida. The

address of Topping White is in West Palm Beach, Florida, which is also petitioner's place of residence. Petitioner uses her home office to handle all financial aspects of her design business. The assets of petitioner's activities include horses, a truck, a trailer, and an automobile. Petitioner uses the truck, trailer, and automobile for both the equestrian and design activities. In May of 1999, petitioner hired Deborah Martin (Ms. Martin). Ms. Martin's primary responsibilities include general administrative work, such as preparing invoices, dealing with clients, collecting money, ordering supplies, scheduling contractors, and entering information into a computer. Petitioner also relies upon trainers both to refer clients and improve her performance as a competitor. Moreover, petitioner works with architects, electricians, plumbers, furniture manufacturers, and other experts in their trades in order to run the interior design aspect of her business. Every one of the trainers that petitioner has worked with has referred at least one design client to petitioner. Petitioner also engages C.P.A. Borofsky to handle her accounting matters.

Petitioner's business methodology consists of entering in and attending horse shows, and making contacts with prospective clients at the shows. Potential clients develop from horse show contacts, and then petitioner and Ms. Martin meet with the potential client. Early on in her business, petitioner tried to

develop clients through her longtime experience playing golf. When golf failed to produce any clients, she dropped her golf club membership.

Petitioner develops her equestrian contact clients for Topping White while competing during the Winter Equestrian Festival, which takes place at the Jockey Club. The Jockey Club is an elite, private club, which is not open to the general public. The Jockey Club consists of a large concentration of extraordinarily wealthy people. Most of the attendees in the Jockey Club own horses, and all come to watch the equestrian competition on either side of the competing rings. The Jockey Club has up to 90 tables with six seats per table. These tables are reserved at the beginning of the season. During the period 1999 through 2001, the cost of a table reservation was $5,000 for the 7-week season. Since then, the price has climbed to $25,000. Petitioner originally owned a table at the Jockey Club, but when the cost of a table increased, she initially split the cost with one client, and then later split the cost with two clients.

At the Jockey Club there is a rectangular tent situated between two competing rings--the DeNemethy Ring, where petitioner sometimes competes, and the Grand Prix Ring, where petitioner frequently competes. The rings contain large leaderboards that are visible throughout the Jockey Club. The events are announced over the loudspeaker, which can be heard throughout the Jockey

Club. When petitioner enters the Grand Prix Ring during competition, her name is flashed on the leaderboards and announced over the loudspeaker as the owner of the horse and once again as the rider. She rides her horses in the Grand Prix Ring where the amateur-owner classes are held. The Grand Prix Ring is a grass field where riders compete with jumps that can exceed 4 to 6 feet in height. Those who compete must finish within a prescribed period without any faults to be successful. Those who successfully complete the first round advance to the second round. When petitioner advances to the second round, upon entry into the ring, her name is once again flashed on the leaderboards and called over the loudspeaker. If she finishes in the ribbons class, her name is displayed yet again on the leaderboards and announced over the loudspeaker. Win or lose, petitioner returns to the Jockey Club among competitors and observers, where conversations take place over the just-completed competition. To continue to develop her design business, petitioner believes she cannot rest on her reputation and disappear from the scene, but she must continue her client development efforts on the equestrian circuit.

The membership requirements for the Jockey Club do not necessitate ownership of a horse or to be a competitor. However, petitioner believes that if she were to sell all of her horses or were to give up amateur riding, both current and prospective

clients would perceive that she had failed financially, would not rely on her as a designer, and thus not trust her with the keys to their homes and their barns.  Petitioner also testified that she has to maintain the reputation she has cultivated as a skilled competitor in order to keep her existing relationships and to cultivate new ones.  We find petitioner's testimony plausible in this regard.

Petitioner does not advertise her interior design business through advertising media such as equestrian-related magazines, Web sites, or newspapers.  In addition, she does not display banners or sponsor any events through Topping White.  Petitioner intentionally rejects this type of advertising because the ethos of the Jockey Club and its members perceive that kind of generic advertising of a personal service business as tacky or gauche.  In addition, petitioner does not want to convey the impression that she is desperate for or needs the work.  Rather, petitioner relies on her exposure and reputation as both a rider and owner, and also her popularity among the members of the Jockey Club.  Instead of actively seeking new clients, petitioner adopts a more subtle approach to attracting prospective clients by making herself available at the Jockey Club during key times in order for prospective clients to find her.  In addition, petitioner also relies on word of mouth and referrals by members of the Jockey Club.

The normal evolution of a design project involves a prospective client's contacting petitioner at a horse show. Normally, the Monday after the horse show, Ms. Martin arranges a meeting between petitioner and the prospective client. The meeting typically takes place at the design site with the potential client, petitioner, and Ms. Martin. In most meetings, approximately half of the discussion is design-related to the actual project, while the other half consists of discussion on equestrian-related subjects. For each of her clients, petitioner has designed at least one horse barn. Petitioner's clients, often very wealthy, entrust her with the keys to their home, even after the projects are completed.

Petitioner uses her general knowledge of horses and specifically her knowledge of the idiosyncracies of each of her client's horses to evolve her barn designs. For example, her knowledge of a horse's particular injury or temperament leads her to design a barn with stalls tailored to each horse's individual needs. Interior design of a client's home often requires knowledge related to horses. Though generally most families do not want an equestrian theme of decoration in their homes, the designing process requires petitioner to know the needs of the families who are essentially "horse people". Some of the designs incorporate mudrooms and expanded storage for boots, saddles, and other equipment. In addition, in the interior design process,

petitioner has to consider bringing "the outside lifestyle as coming to the inside" by testing fabrics for durability, cleaning ability, and recovery relative to the client's everyday livability.

Petitioner keeps records for her horse barn/interior design activities. All of the files relating to client development and design implementation are kept together by year. Petitioner maintains records that keep an inventory of expenses related to both interior design and equestrian-related activities. Initially, petitioner used a manual accounting system, but then upgraded to Excel and then QuickBooks. Petitioner uses QuickBooks to keep records for both the equestrian and interior design activities on a consolidated basis. Petitioner does not keep records of training costs or costs associated exclusively with horse shows for the purposes of projecting a budget. Nor does she or C.P.A. Borofsky prepare monthly budgets or cashflow projections for either the interior design or equestrian activities. According to petitioner, that is because there is no way to predict what those costs will be from month to month, and that the equestrian circuit is not her business but is part of her overall plan to develop her interior design clientele. At trial, petitioner produced documentary evidence of a profit or loss statement prepared by C.P.A. Borofsky that tracked expenses for both her equestrian and interior design activities.

Petitioner also invested in some horses with one of her clients. Petitioner and her client formed a partnership to make these investments. The choice of horses to invest in was based on the recommendations of trainers, at least one of whom was a world champion. The horses petitioner invested in were sold at an overall tax gain because of the depreciation, but the majority resulted in a substantial economic loss on petitioner's investment.[3]

Petitioner filed her Form 1040, U.S. Individual Income Tax Returns, under a married filing separate status for the taxable years 1998, 1999, and 2000, and single status for the taxable years 2001, 2002, and 2004. C.P.A. Borofsky prepared petitioner's Forms 1040 for the years 1998 through 2004. For the tax years 1999 through 2001, C.P.A. Borofsky filed separate Schedules C, Profit or Loss From Business, for the horse and design activities with petitioner's tax returns. Starting in 2002, C.P.A. Borofsky combined the activities on one Schedule C. Petitioner reported net losses from her horse activities and net income from Topping White as follows:

---

[3]Petitioner took depreciation deductions for the horses during the tax years at issue, but she did not sell most of them until after the close of those years. Petitioner did sell one horse named Sonic in 2002 and reported taxable gain on the sale of $34,896. Petitioner did not realize an economic loss on the sale--in fact, she broke even, selling the horse for exactly what her purchase price was.

| Tax Year | Net Loss of Horse Activity | Net Income of Topping White |
|----------|---------------------------|----------------------------|
| 1998 | $47,123 | $200,908 |
| 1999 | 80,735 | 157,239 |
| 2000 | 206,080 | 499,908 |
| 2001 | 275,169 | 322,459 |

On a consolidated basis, however, petitioner's overall business enjoyed a net profit 6 of the first 7 years of the business:

| Year | Gross Income | Cash Expenses | Net Income |
|------|-------------|---------------|-----------|
| 1998 | $253,965 | $100,180 | $153,785 |
| 1999[1] | 276,453 | 199,949 | 76,504 |
| 2000[1] | 707,521 | 413,693 | 293,828 |
| 2001[1] | 542,183 | 494,893 | 47,290 |
| 2002 | 523,038 | 485,279 | 37,759 |
| 2003 | 841,564 | 495,422 | 346,142 |
| 2004 | 498,826 | 506,887 | (8,061) |

[1] Years at issue.

Petitioner is a beneficiary of the Daniel Topping Trust (the trust) from which she received taxable income from 1998 through 2004. For the years in question, that income consisted of $14,060 for 1999, $12,053 for 2000, and $11,882 for 2001. For all of the other years, the amount received from the trust was under $20,000.

On August 26, 2004, respondent mailed to petitioner a notice of deficiency asserting deficiencies for the taxable years 1999, 2000, and 2001. The notice contained no determination regarding the relationship between the horse circuit and the horse barn/interior design activities. The first two adjustments shifted the gross income which petitioner reported from her horse

competition winnings and gain from the sale of one of her horses
from her Schedule C to "other income". Further, the notice
disallowed all of petitioner's Schedule C horse-related expenses,
explaining:

> It has been determined that the amounts claimed as
> Schedule C horse racing expenses for the tax years
> ending 12/31/99, 12/31/2000 and 12/31/2001 are not
> allowable as such since said activity is deemed to be
> an activity not engaged into for profit. It has
> further been determined that said expenses are
> allowable as Schedule A expenses subject to the
> applicable Adjusted Gross Income limitations.
> Accordingly, your taxable income is increased by the
> disallowed expenses adjustment amounts.

The notice also disallowed some of the expenses associated
with petitioner's horse barn/interior design activity,
explaining:

> It has been determined that adjustments are
> warranted to correct your claimed Schedule C expenses
> from your Interior Decorating Activity for the tax
> years ending 12/31/1999 and 12/31/2000. The
> adjustments are a result of a disallowance of expenses.
> The expenses have been disallowed because you have not
> established that these amounts were incurred, or, if
> incurred, paid by you during the taxable year for
> ordinary and necessary business purposes, or that these
> expenses were deductible under the provisions of the
> Internal Revenue Code. Accordingly, your taxable
> income is increased by the adjustment amounts.

Petitioner timely filed her petition with this Court. In
her petition, petitioner assigned error to respondent's
segregation of the equestrian and interior design activities and

also for all other disallowed expenses related to her interior design and equestrian activities.

OPINION

Section 183 restricts taxpayers from deducting losses from an activity that is not "engaged in for profit". Sec. 183(a). An activity is engaged in for profit if the taxpayer entertained an actual and honest profit objective in engaging in the activity. Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs. The taxpayer's expectation of profit must be in good faith. Allen v. Commissioner, 72 T.C. 28, 33 (1979) (citing sec. 1.183-2(a), Income Tax Regs.).

I.   Burden of Proof

Petitioner argues that under section 7491(a), the burden of proof has shifted to respondent. Conversely, respondent contends the burden has not shifted because petitioner was not cooperative within the meaning of section 7491(a), and because petitioner failed to introduce credible evidence necessary for the burden to shift. It is unnecessary for us to address the parties' disagreements and to determine whether the burden of proof has shifted because the outcome of this case is determined on the preponderance of the evidence after trial and is unaffected by section 7491. Estate of Bongard v. Commissioner, 124 T.C. 95 (2005) (citing Blodgett v. Commissioner, 394 F.3d 1030, 1035 (8th

Cir. 2005), affg. T.C. Memo. 2003-212; Estate of Stone v. Commissioner, T.C. Memo. 2003-309).

II. Application of Section 183

Before we address whether petitioner had the requisite profit motive based on the facts and circumstances, we first must address the threshold issue of whether petitioner's equestrian and design undertakings constitute a single activity for purposes of deciding whether petitioner had the requisite profit motive under section 183. We believe in this case that the resolution of this issue skews all of the remaining issues in favor of the party who prevails. Petitioner's arguments for profit motive all revolve around the assumption that the undertakings constitute one activity, while respondent's arguments isolate the equestrian undertaking and its losses to argue that petitioner did not have the requisite profit motive.

Whether Petitioner's Undertakings May Be Treated as One Activity

Multiple undertakings of a taxpayer may be treated as one activity if the undertakings are sufficiently interconnected. Sec. 1.183-1(d)(1), Income Tax Regs. The most important factors in making this determination are the degree of organizational and economic interrelationship of the undertakings, the business purpose served by carrying on the undertakings separately or together, and the similarity of the undertakings. Id. The Commissioner generally accepts the taxpayer's characterization of

two or more undertakings as one activity unless the characterization is artificial or unreasonable.  Id.

We have considered these and other factors in determining whether the taxpayer's characterization is unreasonable.  The other factors so considered include:  (a) Whether the undertakings are conducted at the same place; (b) whether the undertakings were part of the taxpayer's efforts to find sources of revenue from his or her land; (c) whether the undertakings were formed as separate activities; (d) whether one undertaking benefited from the other; (e) whether the taxpayer used one undertaking to advertise the other; (f) the degree to which the undertakings shared management; (g) the degree to which one caretaker oversaw the assets of both undertakings; (h) whether the taxpayer used the same accountant for the undertakings; and (i) the degree to which the undertakings shared books and records.  Mitchell v. Commissioner, T.C. Memo. 2006-145 (citing Keanini v. Commissioner, 94 T.C. 41, 46, (1990); Tobin v. Commissioner, T.C. Memo. 1999-328; Estate of Brockenbrough v. Commissioner, T.C. Memo. 1998-454; Hoyle v. Commissioner, T.C. Memo. 1994-592; De Mendoza v. Commissioner, T.C. Memo. 1994-314; Scheidt v. Commissioner, T.C. Memo. 1992-9)).

We find petitioner's characterization of the equestrian and design undertakings as a single activity for purposes of section 183 to be supported by the facts of this case.  A close

organizational and economic relationship exists between the equestrian and design undertakings.  Petitioner's success as an equestrian competitor creates goodwill that benefits her design business.  See Keanini v. Commissioner, supra.  Petitioner formed the equestrian and design undertakings as a single integrated business.  Petitioner had been a competitor for most of her adult life, and she transformed this sport experience into an avenue to establish goodwill as an interior designer of horse barns and second homes.  She had a plan for an integrated equestrian-based design business.  Petitioner and her assistant manage and oversee both undertakings and their assets and also use the same books and records to track both undertakings.

Further, petitioner's equestrian activities significantly benefit her design business, and we find a significant business purpose for the combination of these undertakings.  Her prominence as a competitor has gained respect among her peers and causes them to seek her out when they are in need of a designer for their horse barns and recreational homes.

Respondent faults petitioner for not advertising in a conventional sense, such as putting up ads in equestrian magazines or banners at horse shows.  Respondent argues that petitioner's failure to specifically advertise the name of Topping White through conventional media is indicative of the lack of an economic relationship between the two undertakings.

However, petitioner testified and had witnesses corroborate that traditional advertising of a personal service business is not welcomed by the clientele petitioner sought.  Thus, petitioner made a business decision not to advertise conventionally.  The question is not whether a particular mode of doing business is wise, but whether the taxpayer honestly believed the method employed would turn a profit for him.  In this case, petitioner's judgment has proven prophetic.  In Dreicer v. Commissioner, 78 T.C. 642 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983), we elucidated that the purpose of section 183 is "to allow deductions where the evidence indicates that the activity is actually engaged in for profit even though it might be argued that there is not a reasonable expectation of profit. * * * This is the proper legal standard under section 183."  Id. at 645.

Further, the evidence demonstrates that petitioner demonstrated good business judgment.  Her equestrian contacts are responsible for more than 90 percent of her client base, and her overall business produced a sizable net profit for all of the years at issue.  Therefore, petitioner has not only demonstrated that she honestly believed that her mode of advertising would turn a profit, but also has proven that it has been successful and that adopting respondent's suggestion would probably have backfired.

Respondent cites several cases where we held that the taxpayer's activities could not be aggregated and argues that those cases are analogous to the facts in this situation. In De Mendoza v. Commissioner, supra, the Court refused to aggregate the taxpayer's farming/polo activity and his real estate law practice, despite the taxpayer's position that one reason he began playing polo was to meet clients for his law firm. Based on the evidence, the Court concluded that the farm was formed and operated as a separate business, and the Court was not convinced that the taxpayer began the polo activity to generate legal business or that the activity materially benefited the taxpayer's law practice. In Wilkinson v. Commissioner, T.C. Memo. 1996-39, we held that a plastic surgeon's horse ranch activities and his medical practice were not interrelated business activities, despite the taxpayer's claim that the publicity he derived from playing polo and hosting social gatherings helped him get patients for his cosmetic surgery practice. Id. In Zdun v. Commissioner, T.C. Memo. 1998-296, affd. without published opinion 229 F.3d 1161 (9th Cir. 2000), we held that a dentist's organic apple orchard was not part of the same activity as his holistic dental practice even though the apples were sold to the dental practice's patients at the office.

We do not find any of the cases respondent relies on to be analogous to petitioner's situation. None of the activities in

those cases have the same level of integration and interdependence that petitioner's equestrian and design activities did. We are persuaded that petitioner's equestrian activities are necessary to the success of her design business. In the equestrian-related cases that respondent cites, it is apparent that the recreational activities were an afterthought to the taxpayer's primary business, and were more of a social opportunity than an integrated part of a symbiotic business plan. In both De Mendoza and Wilkinson, the Court found that the benefit of the ranching activities was "incidental" to the taxpayers' law and medical practices, respectively. Similarly, in De Mendoza, we were not convinced that the taxpayer's polo activity materially benefited his business. In Zdun v. Commissioner, only 10 to 15 percent of the taxpayer dentist's patients actually took the apples he offered, even when he provided the apples to them for no cost.

Here, virtually all of petitioner's clients are equestrian-related contacts who depend on her knowledge and expertise of horses in designing their barns and homes. In addition, the success of petitioner's interior design business is far from incidental to her equestrian contacts. The evidence shows, rather, that petitioner's interior design business materially benefits from her equestrian-related activities, which is consistent with the distinctions made between incidental and material benefit in De Mendoza and Wilkinson. The evidence

demonstrates that petitioner's involvement in the equestrian world is the cornerstone of her cultivation of relationships with her clientele. Given the nature of petitioner's clientele, we find her testimony about the relationship between her equestrian-related activities and her design business to be credible and logical.

Respondent argues that petitioner did not start riding horses for the purpose of promoting her interior design business, citing the fact that petitioner had competed for sport since a young age. We recognize that petitioner's interest in horses and participation in competition preceded the formation of her equestrian-based design activity. Petitioner's business plan as executed abruptly converted her preexisting hobby into part of an integrated business venture after her divorce.

Respondent also relies on the existence of the L.L.C. entitled "Topping White Design" to argue that petitioner's design business was separate from her equestrian activities. Respondent argues that petitioner should be held to the form of her structure, citing the fact that petitioner used the name of Topping White in dealing with third parties. However, there is no basis to restrict petitioner's overall activities to Topping White. Petitioner deals with clients and is known in the equestrian world as "Tracy Topping". Petitioner conducts both aspects of her business through Topping White, using the same

assets, computer program, and files.  The fact that petitioner is known on the basis of her name to her clients in the equestrian world does not somehow make her activities with her equestrian-related contacts separate from her design business, which also bears her name.

We also are aware that for the years at issue, C.P.A. Borofsky reported the activities on two separate Schedules C. Positions taken by a taxpayer in a tax return are treated as admissions and cannot be overcome without cogent proof that they are erroneous.  Mendes v. Commissioner, 121 T.C. 308, 312 (2003); Estate of Hall v. Commissioner, 92 T.C. 312, 337-338 (1989). Based on the plethora of evidence that the two undertakings constitute a single activity, we find that petitioner has overcome that position.

We find that a close organizational and economic relationship exists between the equestrian and the design undertakings.  Accordingly, we determine that for purposes of section 183, the equestrian undertaking and the design operation constitute a single activity.  We need not consider whether petitioner engaged in the equestrian-based design business with the objective of making a profit because the combined activities were profitable in each of the years at issue.[4]

---

[4]Petitioner argues that the presumption under sec. 183(d) applies.  Under sec. 183(d), in the case of an activity consisting in major part of the breeding, training, showing, or
(continued...)

III. Petitioner's Equestrian Expenses Are Ordinary and Necessary in Carrying On the Activities of Topping White

Section 162(a) of the Internal Revenue Code allows the deduction of "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 83 (1992) (citing sec. 162(a)). Respondent argues that even if we determine that the equestrian and design undertakings constitute a single activity and that petitioner had a profit motive, petitioner failed to establish all the equestrian expenses were ordinary and necessary. To be "necessary", an expense must be appropriate and helpful to the taxpayer's business. See Welch v.

---

⁴(...continued)
racing of horses, if the gross income derived from the activity exceeds the deductions for any 2 of 7 consecutive taxable years, then the activity shall be presumed to be engaged in for profit unless the Commissioner establishes to the contrary. See Bunney v. Commissioner, T.C. Memo. 2003-233 (citing Golanty v. Commissioner, 72 T.C. 411, 425 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981)). We find that petitioner's equestrian activities were secondary to her activities as a designer. Therefore, this part of the presumption does not apply. Sec. 183(d) presumes an activity is conducted for profit if the gross income exceeds the attributable deductions for 3 out of 5 consecutive years (the gross income test). The presumption applies only after the third profit year. Mitchell v. Commissioner, T.C. Memo. 2006-145 (citing sec. 183(d)). Since we found that petitioner's equestrian and design activities constitute a single undertaking, the sec. 183(d) presumption applies for the years 2001 and 2002. However, we do not analyze the factors in terms of the presumption because we find that this case turns on the fact that the equestrian and design undertakings were an integrated business. Therefore, we find the presumption to be unnecessary since the characterization of petitioner's design undertaking and equestrian undertaking as a single activity carries the day.

Helvering, 290 U.S. 111, 113 (1933); Carbine v. Commissioner, 83 T.C. 356, 363 (1984), affd. 777 F.2d 662 (11th Cir. 1985). To be "ordinary", the transaction giving rise to the expense must be of common or frequent occurrence in the type of business involved. Deputy v. Dupont, 308 U.S. 488, 495 (1940). Even if it is determined that the expenses are ordinary and necessary, they are deductible under section 162 only to the extent that they are reasonable in amount. United States v. Haskel Engg. & Supply Co., 380 F.2d 786, 788-789 (9th Cir. 1967); Gill v. Commissioner, T.C. Memo. 1994-92, affd. without published opinion 76 F.3d 378 (6th Cir. 1996).

Respondent asserts that the expenses of petitioner's equestrian activities are unreasonable and are not ordinary and necessary because they represent personal expenditures of petitioner. See sec. 262(a). Respondent relies on Henry v. Commissioner, 36 T.C. 879 (1961), to support his argument. In that case, the taxpayer, a C.P.A., sought to deduct the expenses for his boat, upon which he flew a flag bearing the numerals "1040". He asserted that the flag provoked inquiries to which he would reply that he was a C.P.A. and a lawyer experienced in tax law. In disallowing the expenses of the boat, the Court held that the taxpayer failed to prove that the flag made his yacht expenditures "necessary" to his practice. He failed to show exactly how and under what circumstances his boating activities

produced a single client.  Id. at 885.  Further, the taxpayer failed to prove that it was ordinary for people in his profession to incur such expenses.  Id.

While we are mindful that expenses for personal pursuits do not become deductible expenses simply because they afford contacts with possible future clients, the situation in this case is entirely different from the facts in Henry.  Petitioner has proven that her equestrian activities are necessary to her success as an interior designer.  The unique nature of petitioner's design business made it an ordinary expense to partake in equestrian-related activities to achieve the peer acceptance to attract clients.  We have found that petitioner's design and equestrian activity is part of an integrated business plan and that petitioner's clientele is almost exclusively derived from her equestrian contacts.  Petitioner also offered corroborating testimony that individuals in service businesses who use conventional advertising evoke a negative reaction from the people at the Jockey Club.  Respondent's arguments focus on petitioner's means to an end, but neglect the most important fact of all--petitioner's plan worked.  Her startup business was a success from the beginning and continues to be successful, despite a slight loss in 2004.  Petitioner has credibly demonstrated that the measures she takes to build her client base are both ordinary and necessary.

The evidence does not establish and respondent has not argued convincingly that any particular expense was unnecessary or excessive.  Obviously, keeping and maintaining horses is expensive.  Petitioner demonstrated that she has done what she can to keep costs down, from choosing less expensive travel to sharing the cost of a table at the club.  Respondent offers numerous ratios of the expenses associated with the equestrian activities to the profit from Topping White.  Petitioner does what is necessary to maintain her reputation in the equestrian world, and we find that she does not do so in an extravagant manner.  The fact remains that petitioner's design business depends heavily on her equestrian-related activities for its success.  We therefore find and hold that not only are petitioner's equestrian expenses ordinary and necessary, but that they are reasonable in amount.

## Conclusion

Petitioner's equestrian and design activities constitute a single undertaking.  In addition, the expenses associated with the equestrian-related activities are ordinary, necessary, and reasonable in amount.

To reflect the foregoing and concessions by petitioner,

Decision will be entered

under Rule 155.