T.C. Memo. 2012-108

UNITED STATES TAX COURT

ROBIN S. TRUPP, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19477-08.                                    Filed April 12, 2012.

Wallace B. Anderson, Jr., for petitioner.

Laura A. Price, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, Judge:  Petitioner did not file a tax return for 2005, and respondent

prepared a substitute for return (SFR) under section 6020(b).[1]  According to the

_____

[1]Unless otherwise indicated, all section references are to the Internal Revenue
Code in effect for the year in issue, and all Rule references are to the Tax Court
Rules of Practice and Procedure.

SFR, respondent determined a deficiency of $93,841 for 2005. Petitioner contests the deficiency in part, claiming that he is entitled to various deductions not included on the SFR. The parties have made several concessions, including petitioner's concession that he is liable for additions to tax under sections 6651(a) and 6654 on the basis of his taxable income as determined by this Court. The issues remaining for decision are:

(1) whether petitioner is entitled to a section 162 business expense deduction of $2,832 for cellular phone expenses. We hold that he is not;

(2) whether petitioner is entitled to a section 162 business expense deduction of $3,838.50 for expenses incurred in storing client case files. We hold that he is;

(3) whether petitioner is entitled to a section 162 business expense deduction of $4,859.55 for travel expenses. We hold that he is not;

(4) whether petitioner is entitled to a section 162 business expense deduction of $73.85 for an accounting expense. We hold that he is; and

(5) whether petitioner is entitled to a section 162 business expense deduction of $71,836 for equestrian-related expenses incurred as part of petitioner's claimed equine industry law marketing campaign. We hold that he is not.

## FINDINGS OF FACT

At the time the petition was filed, petitioner resided in Florida.

1. Petitioner's Background

During the 1970s petitioner competed in equestrian events all over the country and was at one point considered for the U.S. Olympic Equestrian Team. He retired from riding shortly before entering law school at Tulane University, from which he graduated in 1981. He was admitted to the Florida Bar in 1981 and began to practice law as a litigator.

Petitioner's son, Austin Trupp, began to ride in equestrian shows in the mid-1990s around the age of 12. As a result of his son's riding petitioner was drawn back into the sport, becoming president of an equestrian organization for two years and attending shows. Petitioner also began to represent clients in the equine industry. Petitioner's law firm at the time did not favor representation of equine industry clients, and as a result, petitioner left the firm in the late 1990s to develop his own practice, Robin S. Trupp, P.A.

After several years of solo practice, in 2004 petitioner joined the law firm of Arnstein & Lehr, LLP (Arnstein & Lehr), and continued his practice of equine industry law as a nonequity partner. While petitioner does not practice solely equine industry law, it accounted for most of the fees he earned for Arnstein & Lehr

during 2005. In 2005 petitioner worked in Arnstein & Lehr's Tampa, Florida, office and received $300,795 in gross income from the firm. The Tampa office was the same office petitioner had used for his solo practice. Petitioner and his legal assistant were the only people who worked out of that office.

Upon joining Arnstein & Lehr petitioner signed a "Term Sheet" which discussed certain aspects of petitioner's and the firm's obligations to one another, including information on reimbursement of certain business expenses incurred by petitioner. Arnstein & Lehr had an accountable plan through which petitioner could request reimbursement for business-related expenses. Petitioner's budget for reimbursement of business expenses through the accountable plan was $5,000 in 2004 and $9,600 in 2005.

One of petitioner's accountable plan expenses in 2004 was a $425 advertisement in a "Winter Equestrian Festival" magazine touting petitioner's experience in dealing with equine industry law matters. The advertisement brought in no new business for petitioner. In 2005 petitioner requested and received a total of $3,229.27 in reimbursed business expenses.

In 2006 petitioner requested and was granted a six-month extension to file his 2005 tax return. As of February 11, 2008, petitioner had not filed a 2005 tax return and respondent filed the SFR. On May 19, 2008, respondent issued a notice of

deficiency to petitioner for 2005, according to the SFR. Petitioner timely filed a petition for redetermination of the deficiency and the additions to tax as determined by respondent. On June 19, 2008, petitioner filed a joint tax return with his wife for 2005. At some later point petitioner also provided respondent with an unsigned and undated 2005 Form 1040X, Amended U.S. Individual Income Tax Return.

2. Cellular Phone Expenses

Petitioner had a cellular phone plan with Verizon Wireless which had four phone numbers associated with it. On the 2005 tax return petitioner prepared he claimed a business expense deduction of $8,449 for cellular phone expenses resulting from his Verizon Wireless plan. On the unsigned and undated Form 1040X petitioner reduced this claimed deduction to $3,345 (and then to $2,832 on brief) as a result of including only two of the four numbers on the plan as business numbers.

Petitioner introduced Verizon Wireless monthly account statements from 2005 into evidence. These account statements are for a "Family SharePlan" with four numbers associated with it, one of which is Austin Trupp's number. The account statements do not detail the individual calls made to or from each number during each month, nor do they identify any numbers as business numbers.

3. Storage Expenses

Over years of legal practice petitioner accumulated voluminous client files dating back to 1981 which were in storage during 2005. Petitioner introduced copies of checks and bank account statements which reflected $3,838.50 in payments made to Hyde Park Storage from petitioner and his wife's joint personal bank account in 2005.

Petitioner did not seek to have Arnstein & Lehr reimburse him for the storage expenses out of the accountable plan. Ray Warner, chairman of Arnstein & Lehr's executive committee, testified at trial regarding whether Arnstein & Lehr would have reimbursed petitioner's storage expenses had he made such a request. Mr. Warner stated that Arnstein & Lehr tried "as a matter of policy, to have lawyers maintain their own pre-joinder files."

4. Travel Expenses

Petitioner testified that he incurred expenses traveling on firm business during 2005. According to petitioner, those expenses included hotels, rental cars, and airplane tickets. Petitioner introduced copies of bank account statements from 2005 and his 2005 Diner's Club statements. The bank account was a joint account shared between petitioner and his wife. The Diner's Club Card was issued

through Arnstein & Lehr, but petitioner was personally liable on it and made the payments.

Most of the expenses on both statements are personal expenses, and any business expenses are not so identified. Both statements show various travel expenses incurred, and the Diner's Club statement shows airplane tickets purchased for petitioner, his wife, and his daughter. Petitioner testified that the only expenses he seeks to deduct were those resulting from business travel without his family. Petitioner did not seek to have Arnstein & Lehr reimburse his travel expenses and did not bill these expenses to clients.

5. Accounting Fee

Petitioner introduced an invoice from Judy A. Palmer, P.A. (Judy Palmer), and a copy of a $73.85 check dated March 1, 2005, for the preparation of various Federal tax forms for petitioner's solo practice, Robin S. Trupp, P.A. The check was written on petitioner and his wife's joint bank account.

6. Equestrian-Related Expenses

Petitioner attended equestrian shows with his son throughout his son's childhood, usually arriving Thursday night or Friday morning and leaving on Sunday. The number of shows Austin Trupp rode in during 2005 was not

established, but it was at least five shows. At the shows Austin Trupp rode horses owned by other people.

Petitioner testified that when he attended shows in which his son rode, petitioner was known as the attorney father of Austin Trupp. Petitioner testified that potential clients would approach him at the shows because of his ready availability to deal with their equine industry matters and that he had developed over 40 clients by going to shows from 1998 to the time of trial.

Petitioner did not purchase ringside banner advertisements or set up a table at the shows. He testified that only corporations bought banners and that he found the costs of a table outweighed the benefits. Instead of formally advertising, petitioner would stay ringside and watch his son or others riding. He also relied on word of mouth spreading when his son would place in the top 10 in an event, which resulted in Austin Trupp's name being announced over the loudspeakers to the entire event. Petitioner believed that when people heard Austin Trupp's name they "put two and two together" and thought of Robin Trupp, the equine industry attorney. He testified that when he attended shows in which his son was not riding people wondered why he was there and no new clients approached him.

Petitioner testified that potential clients most often approached him while Austin Trupp was riding or else would leave messages for him at the stables. He

testified that much of his time at the shows was spent doing legal work negotiating horse sales or leases and drafting the contracts and that Austin Trupp sometimes had to call petitioner to tell him when the show was over. Petitioner testified that he would keep track of the time he spent with clients at each show on a notepad and fill in time sheets to bill clients when he returned to the office. He was also in contact with his legal assistant, Susan Samhoury, during weekday shows so that she could provide him with any needed information or complete forms petitioner was working on.

Ms. Samhoury has worked as petitioner's legal assistant since April 2003. She testified that petitioner often came back from the shows with new clients for whom she would draft retainer letters or arrange meetings. She estimated that between April 2003 and December 2005 petitioner brought back approximately 35 new clients as a result of attending shows. Ms. Samhoury did not work on weekends.

Petitioner agreed to pay certain equestrian-related expenses to people who allowed Austin Trupp to ride their horses at shows. Petitioner now claims $71,836 in deductible "Business Promotion" expenses as a result, including payments made for horse shoes, boarding, feeding, grooming, transportation, housing for the horses and various people on the farms, supplements, lessons, and insurance. Petitioner

did not request that Arnstein & Lehr reimburse him for any of the equestrian-related expenses.

In 2005 petitioner collected $920,527 in legal fees from four equine industry clients. Of the $920,527, $875,080 was from a case petitioner had been working on since 2000 (JES case) and $43,297 was from another case which petitioner had been working on since before he joined Arnstein & Lehr (Molly Ashe case). No direct information was provided about the other two 2005 equine industry clients, although one of them appears to have retained petitioner to assist in the purchase of a horse named Kolgani. One of the two unknown clients (possibly the same one involved in the purchase of Kolgani) is listed as a "Horseshoe contact" on a summary of fees collected.

The client in the JES case, Mike Gallagher, had known petitioner when they were teenagers, and they were reacquainted in 2000 at one of the shows in which Austin Trupp rode. The personal connection led Mr. Gallagher to hire petitioner to litigate the JES case. Mr. Gallagher did not hire petitioner because of Austin Trupp's horse-riding activities. The JES case involved an antitrust action and was litigated for several years.

The Molly Ashe case involved the breakup of a partnership which owned a number of top horses. This case was also litigated for several years. Ms. Samhoury

testified that the Molly Ashe case was one of the cases petitioner had secured by going to Austin Trupp's equestrian events and that the case had generated over $500,000 in legal fees for petitioner.

In 2006 petitioner collected $236,591 in legal fees from equine industry clients. Of this amount, $135,549 was from the JES case and $47,556 was from the Molly Ashe case. The remaining $53,486 was from a "Horseshoe contact" (presumably the same client from 2005, although the matter numbers are different) about which no information was provided.

## OPINION

### I. Burden of Proof

Generally, taxpayers bear the burden of proving, by a preponderance of the evidence, that the determinations of the Commissioner in a notice of deficiency are incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Deductions are a matter of legislative grace, and a taxpayer bears the burden of proving entitlement to any claimed deductions. Rule 142(a)(1); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).

Petitioner claims that respondent bears the burden of proof under section 7491(a)(1). Section 7491(a)(1) provides that if, in any court proceeding, the taxpayer introduces credible evidence with respect to factual issues relevant to

ascertaining the taxpayer's liability for a tax, the burden of proof with respect to such factual issues will be placed on the Commissioner. Credible evidence is the quality of evidence which, after critical analysis, a court would find sufficient to decide the issue on if no contrary evidence were submitted. Baker v. Commissioner, 122 T.C. 143, 168 (2004) (quoting Higbee v. Commissioner, 116 T.C. 438, 442 (2001)).

After a review of the evidence presented, we find that petitioner did not introduce credible evidence with respect to the business cellular phone, business travel, and equestrian-related expenses. Therefore, the burden of proof does not shift to respondent on those issues. We decide the remaining issues on the preponderance of the evidence and therefore do not address the burden of proof. Estate of Bongard v. Commissioner, 124 T.C. 95, 111 (2005) (citing Blodgett v. Commissioner, 394 F.3d 1030, 1035 (8th Cir. 2005), aff'g T.C. Memo. 2003-212, and Estate of Stone v. Commissioner, T.C. Memo. 2003-309).

II. Whether Petitioner Is Entitled to Business Expense Deductions for Cellular Phone, Storage, Travel, Accounting, and Equestrian-Related Expenses

Section 162 allows a deduction for all ordinary and necessary business expenses paid or incurred during the taxable year in carrying on any trade or business. The determination of whether an expenditure satisfies the requirements of

section 162 is a question of fact.  Commissioner v. Heininger, 320 U.S. 467, 475 (1943).

A.  Whether Petitioner Is Entitled to a $2,832 Deduction for Cellular Phone Expenses

Respondent argues that petitioner has not provided sufficient evidence to substantiate his claimed cellular phone business expense deduction.  Respondent alternatively argues that petitioner is not entitled to the deduction because he failed to request reimbursement for the expenses under Arnstein & Lehr's accountable plan.  See Lucas v. Commissioner, 79 T.C. 1, 7 (1982) ("A trade or business expense deduction is not allowable to an employee to the extent that the employee is entitled to reimbursement from his or her employer for an expenditure related to his or her status as an employee.").  Petitioner argues that he provided sufficient evidence to substantiate the expenses and that Arnstein & Lehr would not have reimbursed his cellular phone expenses.  We find that petitioner did not provide sufficient evidence to substantiate the cellular phone expense deduction.

Under section 274(d)(4) no deduction is allowed under section 162 for cellular telephone expenses for 2005 unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating the taxpayer's own statement the amount of the expense and the business purpose of the expenditure.  Sec.

280F(d)(4);[2] <u>Bogue v. Commissioner</u>, T.C. Memo. 2007-150. Petitioner produced

no evidence except Verizon Wireless monthly account statements for a "Family

SharePlan" with four numbers associated with it. Petitioner claims two of the four

numbers were business numbers. However, the account statements do not identify

any numbers as business numbers, nor do they detail the individual calls made to or

from each number during the month.

Considering the evidence, we find that petitioner has failed to substantiate the

business purpose of his cellular phone expenses. We therefore hold that petitioner

is not entitled to a deduction for these expenses.

B. <u>Whether Petitioner Is Entitled to a $3,838.50 Deduction for Storage Expenses</u>

Respondent argues that petitioner has not provided sufficient evidence to

substantiate his claimed storage business expense deduction. Respondent

alternatively argues that petitioner is not entitled to the deduction because petitioner

failed to request reimbursement for the expenses under Arnstein & Lehr's

accountable plan. Petitioner argues that he provided sufficient evidence to

---

[2]Sec. 280F(d)(4) was amended by the Small Business Jobs Act of 2010, Pub. L. No. 111-240, sec. 2043(a), 124 Stat. at 2560, which removed cellular phones and other similar telecommunications equipment from "listed property" subject to sec. 274(d). However, that amendment is effective only for tax years beginning after December 31, 2009. <u>Id.</u> sec. 2043(b).

substantiate the expenses and that Arnstein & Lehr would not have reimbursed the storage expenses. We agree with petitioner.

After considering the payments made to Hyde Park Storage and the testimony, we find that petitioner did substantiate the storage expenses. We also believe Mr. Warner's testimony that Arnstein & Lehr tried "as a matter of policy, to have lawyers maintain their own pre-joinder files" and that Arnstein and Lehr would not allow petitioner to be reimbursed for the storage expenses. We hold that petitioner is entitled to a business expense deduction for the storage costs.

C. Whether Petitioner Is Entitled to a $4,859.55 Deduction for Travel Expenses

Respondent argues that petitioner has not provided sufficient evidence to substantiate his claimed travel business expense deduction. Respondent alternatively argues that petitioner is not entitled to the deduction because petitioner failed to request reimbursement for the expenses under Arnstein & Lehr's accountable plan. Petitioner argues that he provided sufficient evidence and claims he did not request reimbursement of the travel expenses because he was saving the money in his accountable plan for other uses. We find that petitioner did not provide sufficient evidence to substantiate the travel expense deduction.

Under section 274(d)(1) no deduction is allowed under section 162 for travel expenses unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating the taxpayer's own statement the amount of the expense, the time and place of the travel, and the business purpose of the expenditure. Petitioner introduced no evidence (and gave little of his own testimony) regarding the business purpose of his travel expenses. We therefore hold that petitioner is not entitled to a business expense deduction for the travel expenses.

### D. Whether Petitioner Is Entitled to a $73.85 Deduction for an Accounting Fee

We are satisfied that the invoice from Judy Palmer and the copy of the check written on petitioner and his wife's joint bank account proves petitioner's entitlement to a $73.85 deduction for the accounting fee paid on behalf of petitioner's solo practice, Robin S. Trupp, P.A.

### E. Whether Petitioner Is Entitled to a $71,836 Deduction for Equestrian-Related Expenses

Deductions are not allowable under section 162 for activities which are carried on primarily as a sport or hobby or for recreation. Sec. 1.183-2(a), Income Tax Regs. Section 183 and the regulations thereunder provide rules to determine whether an activity is engaged in for profit. An activity is engaged in for profit if

the taxpayer entertained an actual and honest profit objective in engaging in the activity. Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), aff'd without opinion, 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs. The taxpayer's expectation of profit must be in good faith. Allen v. Commissioner, 72 T.C. 28, 33 (1979) (citing section 1.183-2(a), Income Tax Regs.).

Respondent argues that petitioner's equestrian-related expenses stem from activities which were not engaged in for profit and are therefore not deductible under section 162. See sec. 1.183-2(a), Income Tax Regs. (deductions are not allowable under section 162 for activities which are carried on primarily as a sport or hobby or for recreation). Petitioner argues that the equestrian activities were engaged in for profit under section 183 (either because his equestrian activities and his legal practice constituted a single activity or under factors enumerated in section 1.183-2(b), Income Tax Regs.) and that section 162 does not otherwise preclude a deduction. We find that petitioner's equestrian activities were not engaged in for profit and therefore no expenses relating to them are deductible under section 162.

### 1. Whether Petitioner's Equestrian Activities and Legal Practice Constituted a Single Activity for Purposes of Section 183

Petitioner first argues that his equestrian activities and his equine industry legal practice constituted a single activity and that the equestrian activities were therefore engaged in for profit. In support of his argument petitioner relies heavily on our decision in Topping v. Commissioner, T.C. Memo. 2007-92.

The taxpayer in Topping was an experienced equestrian who formed a company which provided interior design services for horse barns and recreational homes. To promote her business and meet clients at an exclusive equestrian club, the taxpayer began riding in events held at the club which caused her name to be announced over loudspeaker whenever she began to ride or advanced in the competition. In addition, the taxpayer paid several thousand dollars each season to reserve a table at the equestrian events where she would converse with potential clients after competing. We held that the taxpayer in Topping was entitled to a deduction for her equestrian-related expenses. In reaching this holding we found that section 183 did not preclude a deduction because the equestrian and interior design activities constituted a single activity which was profitable in each of the years at issue.

Multiple undertakings of a taxpayer may be treated as one activity if the undertakings are sufficiently interconnected. Sec. 1.183-1(d)(1), Income Tax Regs. The most important factors in making this determination are the degree of organizational and economic interrelationship of the undertakings, the business purpose served by carrying on the undertakings separately or together, and the similarity of the undertakings. Id. The Commissioner generally accepts the taxpayer's characterization of two or more undertakings as one activity unless the characterization is artificial or unreasonable. Id.

Other factors considered in determining whether a taxpayer's characterization is unreasonable include: (1) whether the undertakings are conducted at the same place; (2) whether the undertakings were part of the taxpayer's efforts to find sources of revenue from his or her land; (3) whether the undertakings were formed as separate activities; (4) whether one undertaking benefited from the other; (5) whether the taxpayer used one undertaking to advertise the other; (6) the degree to which the undertakings shared management; (7) the degree to which one caretaker oversaw the assets of both undertakings; (8) whether the taxpayer used the same accountant for the undertakings; and (9) the degree to which the undertakings shared books and records. Mitchell v. Commissioner, T.C. Memo. 2006-145 (citing Keanini v. Commissioner, 94 T.C. 41, 46 (1990), Tobin v. Commissioner, T.C.

Memo. 1999-328, <u>Estate of Brockenbrough v. Commissioner</u>, T.C. Memo. 1998-454, <u>Hoyle v. Commissioner</u>, T.C. Memo. 1994-592, <u>De Mendoza v. Commissioner</u>, T.C. Memo. 1994-314, and <u>Scheidt v. Commissioner</u>, T.C. Memo. 1992-9).

In <u>Topping</u>, we found that a close organizational and economic relationship existed between the taxpayer's equestrian and design undertakings, that the taxpayer "formed the equestrian and design undertakings as a single integrated business", and that the evidence in that case demonstrated that the taxpayer's "involvement in the equestrian world is the cornerstone of her cultivation of relationships with her clientele". However, the facts in this case do not show such a sufficient interconnectedness between petitioner's equine industry legal practice and his equestrian activities.

In <u>Topping</u> the taxpayer made herself visible to the crowd at the equestrian events by riding in the events and spent money to reserve a table so that she could converse with potential clients after competing. Despite her unconventional means of advertising, we found that her equestrian activities significantly benefited her design business, noting that the evidence showed her equestrian contacts made up over 90% of the client base of her profitable business. We therefore found a

significant business purpose for the combination of her equestrian and design undertakings.

In this case, petitioner did not ride horses himself and did nothing to increase his own exposure to potential clients. Petitioner stayed ringside while his son and others were riding, believing that when they heard his son's name announced over the loudspeakers that they would think of petitioner and his equine industry law practice. We might overlook the lack of advertising if petitioner could show he honestly believed his equestrian activities would generate profits for his legal practice.[3] Topping v. Commissioner, T.C. Memo. 2007-92 ("The question is not whether a particular mode of doing business is wise, but whether the taxpayer honestly believed the method employed would turn a profit for him.") (citing Dreicer v. Commissioner, 78 T.C. 642). However, we believe petitioner failed to show a profit motive for his equestrian activities.

---

[3]Petitioner testified that his traditional advertisement in an equestrian magazine brought in no new business. This is similar to testimony in Topping v. Commissioner, T.C. Memo. 2007-92, that traditional advertising was not effective in garnering new business from people attending the equestrian shows. As a result of the testimony in Topping, we overlooked the lack of traditional advertising when the taxpayer was able to show that, by introducing evidence comparing her expenses with resulting business revenue, she believed her method of advertising would help her business turn a profit.

In <u>Topping</u> we found that the taxpayer showed a profit motive for her equestrian activities by introducing evidence which showed her equestrian contacts comprised over 90% of the client base of her profitable business. On brief petitioner frequently makes the point that his 2005 equestrian expenses of $71,836 were small in comparison with the $920,527 in equine-related legal fees petitioner earned in 2005. However, $875,080 of these fees was from the JES case. The client in that case, Mr. Gallagher, hired petitioner because he knew petitioner personally and not because of Austin Trupp's horse-riding. Even if we accept Ms. Samhoury's uncorroborated testimony that the client in the Molly Ashe case was one of petitioner's equestrian contacts and assume that the remaining two equine industry clients were also equestrian contacts (and no evidence or testimony was provided that they were), petitioner's 2005 equestrian-related expenses are still $26,389 more than the fees generated by his equestrian contacts in 2005.

The numbers look worse for petitioner when the amount of the equestrian-related expenses is compared to the amount of legal fees from new equestrian contacts in 2005. It was established that two of petitioner's four fee paying equine industry clients (Mr. Gallagher and the Molly Ashe client) had been his clients since before 2005. These two clients accounted for $918,377 of the $920,527 in equine

industry legal fees petitioner earned in 2005. Even if we assume that the remaining two equine industry clients were new equestrian contacts in 2005, these two clients still paid only $2,150 in legal fees to petitioner, compared to $71,836 petitioner spent on equestrian-related expenses in 2005.

In addition to equestrian-related expenses exceeding resulting equine industry client fees in 2005, petitioner provided no evidence and only vague testimony relating to the effects those expenses had on his legal fees generated in other years.[4] Petitioner introduced evidence that he collected $236,591 in legal fees from equine industry clients in 2006.[5] However, petitioner did not establish the amount of his equestrian-related expenses in 2006, making a comparison to any resulting legal fees impossible.

Petitioner testified that he had developed over 40 clients by going to shows from 1998 to the time of trial, and Ms. Samhoury estimated in her testimony that between April 2003 and December 2005 petitioner brought back approximately 35 new clients as a result of attending shows. Ms. Samhoury also estimated that the

---

[4]Compare the taxpayer in Topping, who provided her gross income and expenses for each of the years 1998 through 2004 inclusive, even though 1999, 2000, and 2001 were the only years in issue.

[5]Of this $236,591, $135,549 was from the JES case and $47,556 was from the Molly Ashe case. The remaining $53,486 was from a "Horseshoe contact" about which no information was provided.

Molly Ashe case generated over $500,000 in legal fees for petitioner. However, no evidence was provided to substantiate these claims other than evidence which showed that fees petitioner earned from the Molly Ashe case in 2005 and 2006 totaled $90,853. We note that Ms. Samhoury's estimate of 35 new clients between April 2003 and December 2005 seems excessive given that petitioner had only four fee-paying equine industry clients in 2005, of which at most two were new equestrian clients in that year.

Petitioner and Ms. Samhoury also testified that petitioner often did legal work at equestrian events and kept time on notepads before filling in timesheets upon returning to his office. However, no records were produced to substantiate these claims.

We believe the facts described above weigh against petitioner's contention that his participation in the equestrian activities was driven by the desire to turn a profit. After consideration of the facts and applicable factors listed above, we find that petitioner's characterization of his equestrian activities and his legal practice as one activity is unreasonable.

2.  <u>Section 1.183-2(b), Income Tax Regs.</u>

Petitioner argues that even if his equestrian activities and his legal practice do not constitute a single activity, his equestrian activities were still engaged in for profit under the factors enumerated in section 1.183-2(b), Income Tax Regs.  The enumerated factors include:  (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation.  <u>Id.</u>  No one factor is determinative and more weight is accorded to proven objective facts than to mere statements of intent.  <u>Beck v. Commissioner</u>, 85 T.C. 557, 570 (1985); <u>Siegel v. Commissioner</u>, 78 T.C. 659, 699 (1982); <u>Golanty v. Commissioner</u>, 72 T.C. 411, 425-426 (1979), <u>aff'd without published opinion</u>, 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(b), Income Tax Regs.

### a. Manner in Which the Taxpayer Carries On the Activity

The fact that a taxpayer carries on an activity in a businesslike manner and maintains complete and accurate books and records may indicate that the activity is engaged in for profit. Sec. 1.183-2(b)(1), Income Tax Regs. Petitioner claims that he was in "constant contact" with his office while at the equestrian events, kept businesslike records of the hours he billed while at the events, and kept businesslike records of his equestrian-related expenses. We disagree and find this factor favors respondent.

Petitioner testified that he usually arrived at equestrian events Thursday night or Friday morning and left on Sundays. It would therefore have been impossible for him to be in "constant contact" with his office because he and Ms. Samhoury were the only two people who worked in that office and Ms. Samhoury did not work weekends. Ms. Samhoury's testimony indicated she was not otherwise in contact with petitioner on weekends.

Petitioner claims to have kept adequate business records of the hours he billed at the equestrian events but provided only his and Ms. Samhoury's testimony on the subject. Petitioner provided no organized business records pertaining to what shows he attended or the work he performed at those shows. While petitioner provided invoices for several of the equestrian-related expenses, the primary records

he kept of his expenses were voluminous personal bank account and credit card statements which did not contain information such as the purpose of the expenditures.

### b. Expertise of the Taxpayer or His Advisers

Preparation for an activity by extensive study of its accepted business and economic practices or consultation with those who are expert therein, may indicate that a taxpayer has a profit motive where the taxpayer carries on the activity in accordance with such practices. Sec. 1.183-2(b)(2), Income Tax Regs. While petitioner did not consult with advisers or study the relationship between his equestrian activities and his law practice, he was by all accounts already an expert in both areas. We find this factor favors petitioner.

### c. Time and Effort Expended by the Taxpayer in Carrying On the Activity

The fact that the taxpayer devotes much of his personal time and effort to carrying on an activity may indicate an objective to derive a profit, particularly if the activity does not have substantial personal or recreational aspects. Sec. 1.183-2(b)(3), Income Tax Regs. We have previously found that maintaining a full-time job in addition to conducting a purported business activity can be "a

positive factor reflecting * * * [the taxpayer's] motivation". <u>Dickson v. Commissioner</u>, T.C. Memo. 1986-182.

In this case it was not established how much time petitioner spent on his equestrian activities, only that Austin Trupp rode in at least five shows during 2005. Although petitioner had a full-time job working for Arnstein & Lehr, the equestrian activities had substantial personal and recreational aspects for him. Not only did petitioner presumably enjoy watching equestrian shows (as an accomplished former equestrian), but his minor son was competing in the events. Petitioner claimed to have spent much of his time during the events doing legal work but produced no evidence to this effect. We find this factor favors respondent.

### d. Expectation That Assets Used in the Activity May Appreciate in Value

Petitioner argues that his expanding client list and the experience he gained in representing his equine industry clients are assets used in the activity that may appreciate in value by benefiting petitioner's law practice in the future. However, section 1.183-2(b)(4), Income Tax Regs., contemplates only physical assets "such as land, used in the activity". Petitioner has cited, and we have found, no authority for the proposition that section 1.183-2(b)(4), Income Tax Regs., includes his client

list or experience gained.  Indeed, we have previously rejected the position that an increase in a taxpayer's experience is tantamount to capital appreciation.  Kraettli v. Commissioner, T.C. Memo. 1988-413 (racecar driver's experience gain not an appreciating asset to be considered under section 1.183-2(b)(4), Income Tax Regs.).  Because petitioner did not own the horses which Austin Trupp rode, or any other equestrian-related assets, we find this factor does not apply in this case.

### e. Success of the Taxpayer in Carrying On Other Similar or Dissimilar Activities

The fact that a taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable.  Sec. 1.183-2(b)(5), Income Tax Regs.  No evidence was presented that petitioner has previously attempted to bring in business to his law firm by engaging in other activities.  We find this factor does not apply in this case.

### f. Taxpayer's History of Income or Losses With Respect to the Activity

Where losses continue to be sustained beyond the period which customarily is necessary to bring an operation to profitable status, such continued losses, if not explainable as due to customary business risks or reverses, may be indicative that

the activity is not being engaged in for profit.  Sec. 1.183-2(b)(6), Income Tax Regs.

In 2005 petitioner earned $920,527 in equine industry legal fees.  However, $875,080 of these fees was from the JES case.  The client in that case, Mr. Gallagher, knew petitioner personally and did not hire him because of Austin Trupp's horse-riding activities.  Even if we accept Ms. Samhoury's testimony that the Molly Ashe case client was one of petitioner's equestrian contacts and assume that the remaining two equine industry clients were also equestrian contacts, petitioner's 2005 equestrian-related expenses are still $26,389 more than the fees generated by his equestrian clients in 2005.

In 2006 petitioner collected $236,591 in legal fees from equine industry clients.  Of this $236,591, $135,549 was from the JES case and $47,556 was from the Molly Ashe case.  The remaining $53,486 was from a "Horseshoe contact" about which no information was provided.  However, the amount of petitioner's equestrian-related expenses in 2006 was not established, making it impossible to determine whether they were potentially larger than the equine industry legal fees they generated.  We find this factor favors respondent.

### g. Amount of Occasional Profits

The amount of profits in relation to the amount of losses incurred, and in relation to the amount of the taxpayer's investment and the value of the assets used in the activity, may provide useful criteria in determining the taxpayer's intent. Sec. 1.183-2(b)(7), Income Tax Regs. An occasional small profit from an activity generating large losses or from an activity in which the taxpayer has made a large investment, would not generally be determinative that the activity is engaged in for profit. Id. Because petitioner provided information on both his equine industry legal fees and his equestrian-related expenses only for 2005, it is impossible to tell whether the equestrian-related expenses were less than or greater than the resulting legal fees in years other than 2005. We therefore find this factor is neutral in this case.

### h. Financial Status of the Taxpayer

The fact that the taxpayer does not have substantial income or capital from sources other than the activity may indicate that an activity is engaged in for profit. Sec. 1.183-2(b)(8), Income Tax Regs. Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved. Id.

Petitioner earned $300,795 in gross income from his legal practice in 2005. A potential loss from the equestrian activities (if allowed as a deductible section 162 business expense) would generate substantial tax benefits for petitioner. Moreover, there were personal and recreational elements involved with the equestrian activities. Petitioner claims that the equestrian-related expenses contributed to his legal practice gross income of $300,795; however, little evidence was presented to support this claim. We find this factor favors respondent.

### i. Elements of Personal Pleasure or Recreation

The presence of personal motives in carrying on an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved. Sec. 1.183-2(b)(9), Income Tax Regs. On the other hand, a profit motivation may be indicated where an activity lacks any appeal other than profit. Id. It is not, however, necessary that an activity be engaged in with the exclusive intention of deriving a profit. Id. An activity will not be treated as not engaged in for profit merely because the taxpayer has purposes or motivations other than solely to make a profit. Id. Also, the fact that the taxpayer derives personal pleasure from engaging in the activity is not sufficient to cause the activity to be classified as not engaged in for profit if the activity is in fact engaged in for profit as

evidenced by other factors whether or not listed in section 1.183-2(b), Income Tax Regs. Id.

Given his background as a distinguished equestrian, petitioner presumably enjoyed attending equestrian events. His attendance at the events also allowed him to take part in the activities of his minor son. Considering these facts alongside the previously considered factors, we find this factor favors respondent.

j. Conclusion Regarding Section 1.183-2(b), Income Tax Regs.

Petitioner has not argued, and we do not believe, any additional facts outside of those considered in the factors enumerated in section 1.183-2(b), Income Tax Regs., apply in this case. Considering the factors discussed above, we find that petitioner's equestrian activities were not engaged in for profit, and the related expenses are therefore not deductible under section 162.

3. Conclusion on Equestrian-Related Expenses

We find that petitioner's equestrian activities and legal practice did not constitute a single activity and that the equestrian activities were not otherwise engaged in for profit. As a result, the equestrian-related expenses are not deductible as business expenses under section 162. See sec. 1.183-2(a), Income Tax Regs. (deductions are not allowable under section 162 for activities which are carried on primarily as a sport or hobby or for recreation).

F.  <u>Conclusion</u>

We hold that petitioner is not entitled to deductions for cellular phone, travel, or equestrian-related expenses.  We further hold that petitioner is entitled to deductions for storage and accounting expenses of $3,838.50 and $73.85, respectively.

To reflect the foregoing and concessions by the parties,

<u>Decision will be entered</u>

<u>under Rule 155</u>.