T.C. Memo. 2015-243

UNITED STATES TAX COURT

MICHAEL G. JUDAH AND SALLY A. JUDAH, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 18572-13.                    Filed December 16, 2015.

<u>Paul J. Krazeise, Jr.</u> and <u>Alisha M. Harper</u>, for petitioners.

<u>Diana N. Wells</u>, <u>Denise A. Diloreto</u>, and <u>John S. Hitt</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  Petitioners engaged in a saddlebred horse activity.  They

have continued to engage in the activity despite reporting losses for every year of

its existence.  Respondent audited petitioners' Forms 1040, U.S. Individual

Income Tax Return, for taxable years 2008 to 2010 and determined petitioners

were not operating the saddlebred horse activity for profit within the meaning of

[*2] section 183.[1]  Consequently, respondent determined deficiencies of $55,239,

$49,512, and $32,049 in petitioners' Federal income tax for the taxable years

2008, 2009, and 2010, respectively.  Respondent also determined accuracy-related

penalties of $11,066, $9,902, and $6,410 under section 6662(a) for taxable years

2008, 2009, and 2010, respectively.  The issues for decision are:

(1) whether petitioners' real estate and saddlebred horse activities should be

treated as a single undertaking for purposes of section 183(d).  We hold that they

were two separate and distinct activities;

(2) whether petitioners engaged in the saddlebred horse activity from 2008

to 2010 for profit within the meaning of section 183(a).  We hold that they did not;

and

(3) whether petitioners are liable for accuracy-related penalties under

section 6662(a) for 2008 to 2010.  We hold that they are not.

---

[1]Unless otherwise indicated, all section references are to the Internal
Revenue Code in effect for the years at issue, and all Rule references are to the
Tax Court Rules of Practice and Procedure.  All monetary amounts are rounded to
the nearest dollar.

[*3]                        FINDINGS OF FACT

1. <u>Petitioners</u>

Some of the facts have been stipulated, and they are incorporated in our findings by this reference. Petitioners, Sally and Michael Judah, resided in Louisville, Kentucky, at the time of filing the petition.

Petitioners are married and filed joint income tax returns for the years at issue. Michael Judah has a bachelor of business degree from Bellarmine University. Sally Judah has a bachelor of arts degree with a minor in marketing from the University of Kentucky.

Both petitioners are financially successful real estate professionals with many years of experience in the real estate industry. Before commencing the saddlebred horse activity Mr. Judah held executive positions in large real estate companies, and he currently owns and manages several real estate businesses. Mrs. Judah has also held high-level positions in various real estate development companies. She is currently the chief operating officer of a large real estate development firm in Louisville, Kentucky. Petitioners both earned considerable income from the real estate activities during the years at issue.

[*4] 2. <u>Commencement of the Saddlebred Horse Activity</u>

Petitioners attended horse camps as children but otherwise had no substantial connection to the horse industry until the mid-1990s. In or around 1996 petitioners' daughter, Ali Judah, began riding American saddlebred horses.[2] Ali had a natural talent for riding and exhibiting horses, and she became known in the saddlebred horse industry as an excellent show woman. As a result, petitioners began searching for a saddlebred horse to purchase for their daughter.

In 1998 petitioners meet Jo Cornell, a horse trainer with over 20 years of experience. Petitioners were impressed with Ms. Cornell's background in the horse industry and started taking Ali to Ms. Cornell's stables for riding lessons. Petitioners also sought advice from Ms. Cornell in purchasing a saddlebred horse. After seeking input from Ms. Cornell, petitioners purchased their first horse.

Petitioners began to claim deductions for business expenses related to their saddlebred horse activity after purchasing said horse, and since this point, they have continued to deduct expenses for the saddlebred horse activity through the 2014 taxable year. The expenses stemmed from promoting Ali as a saddlebred horse rider. For example, petitioners deducted the costs of attending horse shows

---

[2]An American saddlebred horse is "a breed of 3-gaited or 5-gaited saddle horses developed chiefly in Kentucky from Thoroughbreds and smooth-gaited stock." Merriam-Webster's Collegiate Dictionary 37 (10th ed. 1993).

[*5] throughout the United States and the costs of Ali's equipment, clothing, training fees, and other miscellaneous items associated with showing saddlebred horses.

### 3. Formation of Judah Saddlebreds

Petitioners conducted their saddlebred horse activity as a sole proprietorship the first two years of business. Sometime in 1998 petitioners met William Malone, a certified public accountant (C.P.A.) with the accounting firm Deeming, Malone, Livesay, and Ostroff. Petitioners hired Mr. Malone to prepare their income tax returns, and Mr. Malone also advised them to form separate limited liability companies for their horse and real estate businesses. On December 6, 1999, petitioners filed articles of organization with the Kentucky secretary of state and formed Judah Saddlebreds, LLC (Judah Saddlebreds). Judah Saddlebreds was formed as a member-managed LLC with Mr. Judah as the sole member and manager. Mr. Malone further instructed petitioners to keep their real estate and saddlebred horse activities completely separate. Adhering to Mr. Malone's advice, petitioners maintained separate books, records, and bank accounts for their real estate and horse activities. On December 8, 1999, petitioners opened a checking account under the name "Judah Saddlebreds, LLC". All income and

**[*6]** expenses generated by petitioners' saddlebred horse activity were reflected in statements from that bank account.

4. Business Plan and Expert Advice

Petitioners argue that their plan was to purchase young horses and then increase the horses' value through training and competing at shows. Petitioners believed they could thus acquire horses at a relatively low cost and exponentially increase the horses' market value. However, Ali's personal use was always the primary consideration in purchasing a horse; petitioners never bought a horse that was unfit for their daughter to ride.

Petitioners did not prepare a written business plan before commencing their saddlebred horse activity. Judah Saddlebreds' formal business organization documents are the only evidence of a written business plan. The business purpose of Judah Saddlebreds, as stated in the LLC operating agreement, is "to operate in the horse industry by purchasing, breeding, training, showing and selling horses". Judah Saddlebreds' mission statement similarly states: "The Mission of Judah Saddlebreds LLC is to locate and acquire quality horses, which, through proper training, successful performance, and potential breeding will both enhance the value of the breed and return a substantial profit to the business". The mission statement was prepared in or around 2004, years after petitioners first engaged in

[*7] the saddlebred horse activity. Petitioners did not prepare financial projections, budgets, or expected cashflow statements before commencing the saddlebred horse activity.

Petitioners always sought input from their trainers before purchasing a horse. The main criteria in selecting a horse were its age, ability to be trained, and suitability for Ali's skill level. Petitioners also independently ensured that the asking price of a horse was reasonable, and petitioners hired veterinarians to inspect each horse before they acquired it. Petitioners would also board the horse for a trial period while deciding whether to purchase it. During the trial period petitioners paid all boarding and training expenses for the horse. Petitioners consulted with the trainers before selling horses as well. This was because the trainers knew the horses' backgrounds and show records, both being key factors in establishing the saddlebred horses' market values.

Petitioners' trainers also provided advice as to what shows to enter and what horse to exhibit at a show. The trainers knew which event and horse bolstered Ali's chances of success. The trainers did recommend riders other than Ali to show petitioners' horses, but this was not a common practice. Rather, Ali was the main rider in most horse shows.

**[*8]** 5. Books and Records

The books and records of Judah Saddlebreds have at all times been maintained by Mr. Judah. Mr. Judah's accounting method consisted of compiling bank statements and receipts that were generated over the course of the taxable year. At yearend Mr. Judah prepared a handwritten summary of income and expenses and delivered it to Mr. Malone. Mr. Malone or another C.P.A. would then prepare petitioners' income tax returns using the handwritten summary of income and expenses.

Judah Saddlebreds' books and records did not separately account for operating expenses attributable to each individual horse. The books and records merely reflected the aggregate of income and expenses generated for the operation as a whole. Petitioners' records did not track the costs of training, feeding, showing, or grooming for each individual horse. Consequently, petitioners could not determine the needed sale price to recoup operating expenses of a specific animal.

6. Time and Effort in Saddlebred Horse Activity

Petitioners were unable to devote substantial time to their saddlebred horse activity. Petitioners had full-time jobs and other responsibilities outside of the horse activity. Mr. Judah allocated most of his professional time to his real estate

[*9] businesses, and Mrs. Judah worked approximately 60 hours a week as a chief operations officer in a real estate company. The time petitioners did allocate their saddlebred horse activity generally consisted of visiting their horses once a week, speaking with their trainers on the phone or in person, attending horse shows, preparing advertisements, and recording receipts and expenses. Petitioners did not feed, groom, ride, or train their horses. Furthermore, petitioners did not tend to the stables.

During the years at issue petitioners were members of multiple horse associations. Mrs. Judah was a member of the United States Professional Horseman's Association, the United States Equestrian Association, the American Saddlebred Horse Association, and the Kentucky American Saddlebred Horse Association. Mr. Judah was a member of the American Saddlebred Horse Association, the United Professional Horse Association, the Kentucky American Saddlebred Horse Association, and Rock Creek Riding Club. Mr. Judah was also the vice president and a board member of Rock Creek Riding Club.

7. Advertising

Petitioners advertised their horses through print sources, online publications, and horse shows. Horse shows also provided a forum for marketing horses. Petitioners paid for travel, meals, and hotel costs for themselves, Ali, and

[*10] the trainers while at horse shows. Petitioners also paid for the costs of boarding, feeding, and transporting horses to the shows. During the years at issue, petitioners attended 15 horse shows, each ranging between two and seven days.

8. Profitability of Saddlebred Horse Activity

Petitioners have never made a profit in their saddlebred horse activity. Their sources of income from their saddlebred horse activity were through the sales of horses and horse show winnings. However, petitioners concede that horse show winnings were marginal. Petitioners never generated income in the breeding operations either. The following table lists each of petitioners' horses, the purchase price, and the corresponding sale price from 1998 to 2012:

| Horse name | Purchase date | Purchase price | Sale date | Sale price |
|---|---|---|---|---|
| Lady's Bay Day | 10/10/1998 | $44,000 | 6/15/2000 | $100,000 |
| Riva Diva | 12/28/1998 | 40,000 | 3/7/2006 | 150,000 |
| Selby Lane | 1/5/2001 | 80,000 | 6/30/2002 | 110,000 |
| Champagne in Winter | 7/20/2001 | 125,000 | 9/15/2004 | 83,500 |
| Eddyrile | 5/30/2002 | 2,000 | Never sold | --- |
| Radiant Success | 9/30/2002 | 165,000 | 7/15/2005 | 25,000 |
| I'm a New York Diva | Born -- 4/17/2005 | --- | Donated -- 5/19/2008 | --- |

| | | | | |
|---|---|---|---|---|
| [*11] Divine Renaissance | 2/17/2006 | 137,500 | 8/27/2010 | 90,000 |
| New York's Perfect Diva | Born -- 2/1/2006 | --- | Transferred -- 2/1/2012 | --- |
| Hollywood Agent | 2/20/2008 | 150,000 | 8/5/2010 | 190,000 |
| Iza Diva | 11/28/2010 | 20,000 | Currently owned | Currently owned |
| Leatherwood Lift-Off | 7/11/2012 | 65,000 | Currently owned | Currently owned |

Although petitioners have sold a number of horses for more than their purchase prices, they have still generated nearly $1.5 million in losses since 1998. The following table lists the reported loss from each year with respect to petitioners' saddlebred horse activity:

| Taxable year | Net profit (loss) |
|---|---|
| 1998 | ($11,370) |
| 1999 | (50,312) |
| 2000 | --- |
| 2001 | --- |
| 2002 | (166,385) |
| 2003 | (171,319) |
| 2004 | (177,642) |
| 2005 | (122,652) |
| 2006 | (172,766) |

**[*12]**

| | | |
|---|---|---|
| | 2007 | (186,145) |
| | 2008 | (163,286) |
| | 2009 | (131,655) |
| | 2010 | (132,182) |
| | 2011 | (30,162) |
| | 2012 | (50,776) |

9. Operating Expenses

Petitioners' substantial losses were due to high operating expenses. Boarding, training, and showing the horses were by far the largest expenses. At all times, petitioners kept horses at the trainers' facilities. In turn, this generated constant feeding, boarding, veterinarian, and other costs generally associated with owning horses. In addition, petitioners incurred a monthly fee for training their horses. The trainers specifically trained horses according to Ali's riding style and abilities. In the years prior to those at issue, petitioners claimed business expense deductions for the costs of Ali's riding lessons when she trained at Ms. Cornell's stables. When Ali stopped taking riding lessons in 2005, petitioners no longer incurred that expense.

Show expenses required petitioners to pay extra wages to their trainers because of the extra time to attend the shows as well as the time it took for the

[*13] trainers to travel to the shows. Petitioners also incurred horse show costs of VIP box seats, entry fees, horse stall fees, and horse bedding fees.

Petitioners financed their acquisition of horses with loans of approximately $600,000. The loans were taken in Judah Saddlebreds' name and secured by Judah Saddlebreds' horses and personal guaranties from Mr. Judah. Interest expenses on the loans were paid by Judah Saddlebreds. JREG or Judah Construction would pay the interest expenses when Judah Saddlebreds had insufficient funds. Other significant expenses were section 179 depreciation expenses for the horses and mortality insurance for the horses.

10. Petitioners' Real Estate Activities

Petitioners argue that their real estate and saddlebred horse activities constituted a single undertaking for purposes of section 183.

Mr. Judah is the owner of various real estate businesses. Mr. Judah formed Judah Real Estate Group, LLC (JREG), on December 6, 1999, by filing articles of organization with the Kentucky secretary of state. Mr. Judah has at all times been the single member and manager of JREG. JREG's articles of organization provide that "[t]he business of the company shall be to act as a real estate broker." Notably, the articles of organization do not refer to petitioners' saddlebred horse activity. JREG's operating agreement provides that JREG's purpose is to

[*14] "perform and operate as a real estate brokerage firm, with duties of sale and leasing of commercial and residential property in Louisville, Kentucky. In addition, the Company is to perform duties associated with managing the development of both residential and commercial property." JREG's operating agreement does not mention its interrelationship with petitioners' saddlebred horse activity. Between December 6, 1999, and April 23, 2002, JREG and Judah Saddlebreds maintained the same principal office. From April 24, 2002, onward, JREG and Judah Saddlebreds never maintained the same address again. The following table lists JREG's net profits from 2002 to 2012:

| Year | Net profit |
|------|-----------|
| 2002 | $166,571 |
| 2003 | 137,545 |
| 2004 | 156,904 |
| 2005 | 237,321 |
| 2006 | 327,367 |
| 2007 | 93,475 |
| 2008 | 36,127 |
| 2009 | 102,411 |
| 2010 | 46,152 |
| 2011 | 113,163 |
| 2012 | 282,234 |

[*15] Mr. Judah formed Judah Construction, LLC (Judah Construction), on January 4, 2002. Judah Construction was formed as a member-managed LLC with Mr. Judah as the sole member and manager. At trial petitioners did not provide Judah Construction's operating agreement or other documents to establish the company's business purpose or relationship with petitioners' saddlebred horse activities. Moreover, Judah Construction has never operated from the same location as petitioners' saddlebred horse activity. The following table lists Judah Construction's net profits from 2002 to 2012.

| Year | Net profit (loss) |
|------|-------------------|
| 2002 | $1,593 |
| 2003 | (1,276) |
| 2004 | 5,429 |
| 2005 | 12,770 |
| 2006 | 1,909 |
| 2007 | --- |
| 2008 | (695) |
| 2009 | 147,294 |
| 2010 | 39,643 |
| 2011 | 2,340 |
| 2012 | (24,427) |

[*16] Mr. Judah owned other businesses that operated in the real estate industry, but petitioners do not contend that they were part of a single activity for purposes of section 183.[3]

The accounting records of JREG and Judah Construction were maintained by Mr. Judah. At all times, petitioners' real estate businesses have tracked expenses and revenues for each property, development, or project individually. Moreover, the books and records for the real estate businesses were maintained contemporaneously with business operations. Mr. Judah also prepared financial projections when proposing real estate developments to potential investors. Furthermore, both JREG and Judah Construction prepared financial statements such as balance sheets and income statements.

Petitioners commonly transferred funds from JREG to Judah Saddlebreds given Judah Saddlebreds' inability to generate a profit. These transfers were documented within JREG's financial statements, journals, and ledgers with a specific account number. JREG treated the transfers to Judah Saddlebreds as nondeductible expenses for Federal tax purposes. On the other hand, transactions between petitioners' various real estate businesses were expensed for Federal

---

[3]The other real estate entities owned by Mr. Judah were Judah Development Group, LLC; Triple Crown Contractors, LLC; and Judah Nachand, LLC.

[*17] income tax purposes and a Form 1099-MISC, Miscellaneous Income, was issued to document each expense.

According to petitioners, Judah Saddlebreds was used to generate clients for JREG and Judah Construction. Petitioners claim that their saddlebred horse activity was instrumental in obtaining real estate clients. We note that only one client specifically used Mr. Judah's real estate services because of his knowledge of the horse business and horse property. However, neither JREG nor Judah Construction performed work for the client; instead, it was Triple Crown Contractors. All the other clients used Mr. Judah's real estate services because of a close personal relationship with petitioners or because they knew and respected his professional workmanship.

11. IRS 2004 Examination

In 2007 the Internal Revenue Service (IRS) initiated an examination of petitioners' 2004 income tax return. The scope of the audit included whether petitioners conducted their saddlebred horse activity with an intent to earn a profit. Crystal Fitzgerald, the revenue agent who audited petitioners' 2004 return, testified that petitioners never contended that they operated Judah Saddlebreds as a single undertaking with JREG and Judah Construction. The IRS issued a "no change" letter after the conclusion of the 2004 audit.

**[*18]** 12. IRS 2013 Examination and Notice of Deficiency

More of petitioners returns were audited in 2013. This time the Service issued a notice of deficiency disallowing petitioners' 2008, 2009, and 2010 business expense deductions for Judah Saddlebreds and determining penalties pursuant to section 6662(a) for 2008, 2009, and 2010. Petitioners timely petitioned this Court redetermination.

OPINION

I. Burden of Proof

The taxpayer generally bears the burden of proving the Commissioner's determinations are erroneous. Rule 142(a). The burden of proof may shift to the Commissioner if the taxpayer satisfies certain conditions. Sec. 7491(a). Petitioners argue that under section 7491(a), the burden has shifted to respondent. Conversely, respondent contends the burden has not shifted because petitioners failed to introduce credible evidence necessary for the burden to shift. However, we decide the section 183 issue on the preponderance of the evidence after trial and, therefore, we need not address the burden of proof. Estate of Bongard v. Commissioner, 124 T.C. 95, 111 (2005) (citing Blodgett v. Commissioner, 394 F.3d 1030, 1035 (8th Cir. 2005), aff'g T.C. Memo. 2003-212, and Estate of Stone

**[\*19]** <u>v. Commissioner</u>, T.C. Memo. 2003-309); <u>Mathis v. Commissioner</u>, T.C. Memo. 2013-294.

## II.  Separate Undertakings v. Single Undertaking

Before we address whether petitioners had the requisite profit motive, we must address the threshold issue of whether petitioners' saddlebred horse and real estate activities constituted a single undertaking for purposes of section 183.  We believe the resolution of this issue affects the resolution of all remaining issues in favor of the party who prevails in the light of section 183(d), which provides:

> If the gross income derived from an activity for 3 or more of the taxable years in the period of 5 consecutive taxable years which ends with the taxable year exceeds the deductions attributable to such activity (determined without regard to whether or not such activity is engaged in for profit), then, unless the Secretary establishes to the contrary, such activity shall be presumed for purposes of this chapter for such taxable year to be an activity engaged in for profit.  In the case of an activity which consists in major part of the breeding, training, showing, or racing of horses, the preceding sentence shall be applied by substituting "2" for "3" and "7"for "5".

Petitioners have never earned a profit from their saddlebred horse activity.  On the other hand, petitioners' real estate activities have been profitable.  The following table lists the reported net profits from JREG, Judah Construction, and Judah Saddlebreds and the income from the three activities combined:

[*20]

| Year | JREG net profit (loss) | Judah Construction net profit (loss) | Judah Saddlebreds net profit (loss) | Combined net profit (loss) |
|---|---|---|---|---|
| 2002 | $166,571 | $1,593 | ($166,385) | $1,779 |
| 2003 | 137,545 | (1,276) | (171,319) | (35,050) |
| 2004 | 156,904 | 5,429 | (177,642) | (15,309) |
| 2005 | 237,321 | 12,770 | (122,652) | 127,439 |
| 2006 | 327,367 | 1,909 | (172,766) | 156,510 |
| 2007 | 93,475 | --- | (186,145) | (92,670) |
| 2008 | 36,127 | (695) | (163,286) | (127,854) |
| 2009 | 102,411 | 147,294 | (131,655) | 118,050 |
| 2010 | 46,152 | 39,643 | (132,182) | (46,387) |
| 2011 | 113,163 | 2,340 | (30,162) | 85,341 |
| 2012 | 282,234 | (24,427) | (50,776) | 207,031 |

Thus, treating petitioners' real estate and saddlebred horse activities as a single undertaking yields a net profit in at least two of the last seven years, thereby creating the presumption that petitioners conducted their saddlebred horse activity

[*21] with an intent to earn a profit.[4]  Accordingly, petitioners have a strong tax incentive in taking said position under section 183(d).

Petitioners contend that Judah Saddlebreds was a marketing and customer development platform for JREG and Judah Construction.  Petitioners argue that Judah Saddlebreds' existence allowed them to network with wealthy horse owners who would be willing and able to purchase real estate.  Respondent maintains that petitioners' real estate activities were separate and distinct from their saddlebred horse activity and the two did not constitute a single undertaking for purposes of section 183(d).

Multiple undertakings of a taxpayer may be treated as one activity if the undertakings are sufficiently interconnected.  Sec. 1.183-1(d)(1), Income Tax Regs.  The most important factors in making that determination are the degrees of organizational and economic interrelationships of the undertakings, the business purpose served by carrying on the undertakings separately or together, and the similarity of the undertakings.  Under the regulations, the Commissioner generally

---

[4]Petitioners would have generated a net profit in 2005, 2006, and 2009 if we were to treat JREG, Judah Construction, and Judah Saddlebreds as a single undertaking. Thus, petitioners would met the requisites for the presumption under sec. 183(d) for 2008, 2009, and 2010.

**[*22]** accepts the taxpayer's characterization of two or more undertakings as one activity unless the characterization is artificial or unreasonable.

We have considered these and other factors in determining whether the taxpayer's characterization is unreasonable. The other factors so considered include: (a) whether the undertakings are conducted at the same place; (b) whether the undertakings were part of the taxpayer's efforts to find sources of revenue from his or her land; (c) whether the undertakings were formed as separate activities; (d) whether one undertaking benefited from the other; (e) whether the taxpayer used one undertaking to advertise the other; (f) the degree to which the undertakings shared management; (g) the degree to which one caretaker oversaw the assets of both undertakings; (h) the degree to which the undertakings shared an accountant; and (i) the degree to which the undertakings shared books and records. Topping v. Commissioner, T.C. Memo. 2007-92; Mitchell v. Commissioner, T.C. Memo. 2006-145 (citing Keanini v. Commissioner, 94 T.C. 41, 46, (1990), Tobin v. Commissioner, T.C. Memo. 1999-328, Estate of Brockenbrough v. Commissioner, T.C. Memo. 1998-454, Hoyle v. Commissioner, T.C. Memo. 1994-592, De Mendoza v. Commissioner, T.C. Memo. 1994-314, and Scheidt v. Commissioner, T.C. Memo. 1992-9).

**[*23]** A. <u>Location of the Activities</u>

Petitioners did not conduct their saddlebred horse and real estate activities in the same location. During the years at issue Judah Saddlebreds was operated from petitioners' personal residence while JREG and Judah Construction were operated from an office location. This factor favors respondent.

B. <u>The Activities as Efforts To Derive Revenue From Land</u>

Petitioners' saddlebred horse activity did not use land to generate a profit, and Judah Saddlebreds did not own real property. This factor favors respondent.

C. <u>Formation of Activities</u>

Petitioners commenced their saddlebred horse activity in 1998 but did not initially form a business entity, i.e., Judah Saddlebreds. On December 6, 1999, petitioners formed Judah Saddlebreds and JREG. On January 4, 2002, petitioners formed Judah Construction. Petitioners argue that this factor should weigh in their favor because Judah Saddlebreds and JREG were formed on the same day. We disagree.

Petitioners conducted the saddlebred horse activity for nearly two years before forming JREG. Mr. Judah also conducted his real estate activities for sometime before forming JREG. The mere fact that petitioners formally created a business entity to conduct their preexisting saddlebred horse activity does not

[*24] mean that they commenced their real estate and horse activities at the same time. Moreover, petitioners did not deduct business expenses for JREG until 2002 but claimed deductible business expenses for Judah Saddlebreds in 1998. Judah Construction was formed nearly three years after petitioners began their saddlebred horse activity. Judah Construction did not claim deductible business expenses until 2002 either.

In addition, the formation documents of Judah Saddlebreds, JREG, and Judah Construction do not establish that petitioners intended for these activities to be operated as a single undertaking. Judah Saddlebreds' operating agreement does not mention anything about real estate. Rather, its stated purpose is "to operate in the horse business industry by purchasing, breeding, training, showing and selling horses." Likewise, Judah Saddlebreds' mission statement does not refer to petitioners' real estate activities. Petitioners failed to introduce the organizational documents for Judah Construction. Consequently, we hold that petitioners did not form JREG, Judah Construction, and Judah Saddlebreds as a single undertaking. This factor favors respondent.

D. Each Activity's Benefit to the Other

Petitioners argue that the saddlebred horse activity provided substantial benefit to the real estate businesses by generating customers from within the

[*25] saddlebred horse industry. We do not address whether the real estate businesses benefited the saddlebred horse activity because petitioners have not made that argument and therefore concede that point.

In Topping v. Commissioner, T.C. Memo. 2007-92, we addressed whether a taxpayer's equestrian activities benefited her barn/interior design activities. We held that this factor favored the taxpayer, but the facts were drastically different from those of the present case. The taxpayer in Topping generated more than 90% of her interior design clientele through equestrian activity contacts. Id., slip op. at 7. This was because the taxpayer's barn/interior design clients wanted structures specifically designed for horses and therefore solicited her services because of her involvement and expertise in the horse industry. Id. at 6.

Unlike the barn/interior design activities of the taxpayer in Topping, petitioners' real estate activities are not dependent on, or materially benefited by, their saddlebred horse activity. Petitioners' saddlebred horse activity contributed very little to the income of JREG and Judah Construction. In fact, the saddlebred horse activity drained the financial resources of the real estate businesses; petitioners commonly transferred funds to cover Judah Saddlebreds' operating expenses, but Judah Saddlebreds never returned those funds because of constant

[*26] operating deficits. Testimony from the clients of Mr. Judah's real estate businesses also fails to support petitioners' position under this factor.

Petitioners' clients did not use Mr. Judah's real estate businesses because they wanted to sell, buy, or construct property that accommodated horses. These clients also contributed very little income to petitioners' real estate businesses during the years at issue. Indeed, there was only one person who testified she specifically used Mr. Judah's real estate services because of his background in the saddlebred horse industry. However, Triple Crown Contractors was the entity that performed the work, not JREG or Judah Construction, and petitioners do not contend that Triple Crown Contractors was part of a single undertaking with Judah Saddlebreds.

After considering the testimony offered to support petitioners' position, we are convinced that the benefits each activity derived from the other were merely incidental and fortuitous. Petitioners' real estate customers were unconcerned with Mr. Judah's involvement in the saddlebred horse industry. Instead, testimony established that Mr. Judah's real estate services were used because of established and trusted relationships or because of his reputable workmanship. Moreover, the revenue collected from witnesses offered to support petitioners' position is marginal in comparison to the overall income of JREG and Judah Construction.

**[\*27]** <u>See</u> <u>Price v. Commissioner</u>, T.C. Memo. 2014-253, at \*37 (noting that a taxpayer's automobile sales to horse customers amounted to less than 1% of all sales). It falls far short of the level in <u>Topping</u>, and we fail to see how JREG and Judah Construction were benefited by Judah Saddlebreds.

Petitioners' arguments more closely resemble those advanced by the taxpayer in <u>Henry v. Commissioner</u>, 36 T.C. 879 (1961). In <u>Henry</u>, the taxpayer was a tax attorney who purchased a yacht on which he flew a red, white, and blue pennant with the numerals "1040" on it. <u>Id.</u> at 880. The taxpayer argued that the yacht and pennant sparked inquiries from other yacht owners and thereby generated clients for his law practice. <u>Id.</u> However, like petitioners, the taxpayer in <u>Henry</u> was unable to substantiate how much of an economic benefit this practice provided to his law business. In disallowing the deduction of the yacht expenses we held:

> [W]ere we to recognize that expenditures for normally personal pursuits become deductible business expenses simply because they afford contacts with possible future clients without showing a more direct relationship to the production of business income, it is evident that most all club dues and similar expenditures, for example, as well as the expense of appearing at the right place at the right time with the right people, could be claimed as ordinary and necessary business expense.  \* \* \* [<u>Id.</u> at 886.]

[*28] We find no tangible business relationship between petitioners' saddlebred horse and real estate activities. Like the yacht and pennant in <u>Henry</u>, petitioners' saddlebred horse activity generated little, if any, income for JREG and Judah Construction. Petitioners' saddlebred horse activity did allow them to mingle with prospective clients; but we are not persuaded that such conduct created a tangible benefit for Mr. Judah's real estate businesses. Accordingly, this factor favors respondent.

E. <u>Cross-Advertising</u>

Cross-advertising between the activities was minimal. Petitioners displayed a banner for JREG or Judah Construction at horse shows they co-sponsored, but these banners failed to advertise Judah Saddlebreds. Petitioners also advertised JREG and Judah Construction in the programs of the horse shows they participated in, but these advertisements also failed to make any reference to Judah Saddlebreds. Thus, aside from petitioners' last name, there was no cross-advertising from these solicitations at horse shows.

Petitioners argue that the cross-advertising consisted mainly of attending horse shows, which allowed them to socialize with potential real estate customers. In <u>Price v. Commissioner</u>, T.C. Memo. 2014-253, the taxpayers operated a car dealership alongside their horse business. The taxpayers argued that they cross-

**[*29]** advertised by giving away T-shirts and free cars at horse shows. Id. at *38. We said "this argument ignores the fact that marketing the dealerships at horse shows could also have been done solely to capture a target demographic and would not require the existence of * * * [a horse business] as part of the automobile dealership activity." Id. at *38-*39. Like the taxpayer in Price, petitioners could have attended horse shows to mingle with the attendees without Judah Saddlebreds' existence. Such a business practice did not require $1.5 million of expenses; in contrast, it required only the cost of an admission ticket. This factor favors respondent.

F. Shared Management

Mr. Judah was the single member and manager of Judah Construction, JREG, and Judah Saddlebreds. There is insufficient managerial overlap because these entities share management only in the form of Mr. Judah. See id. at *39; Estate of Stangeland v. Commissioner, T.C. Memo. 2010-185.

G. Shared Caretaker

In Price v. Commissioner, at *39 (quoting Webster's Ninth Collegiate Dictionary 208 (1985)), we held that the general dictionary definition of a caretaker is "one that takes care of the house or land of an owner who may be absent". Petitioners' trainers were the caretakers of the horses, but their trainers

[*30] did not function as the caretakers of their real estate properties as well. Thus, there is no overlap of caretakers between petitioners' real estate and horse activities. This factor favors respondent.

H. Shared Accountant

Petitioners did not employ a shared accountant for their real estate and saddlebred horse activities. Petitioners argue that Mr. Malone was a shared accountant by virtue of preparing Schedules C, Profit or Loss From Business, for petitioners' various entities. However, Mr. Malone's services were limited to preparing petitioners' income tax returns. Other than this, Mr. Malone did not provide any type of financial advice or services in regard to petitioners' saddlebred horse activity. In Price, the taxpayer's C.P.A. prepared the Schedules F, Profit or Loss From Farming, for the taxpayer's business entities that were claimed to be part of a unitary business operation. Id. at *40. We held that this factor favored the Commissioner because the C.P.A. was required to prepare the taxpayer's personal income tax return, and in the process, prepared the Schedules F. In the present case, Mr. Malone prepared petitioners' personal tax returns and therefore had to prepare the various Schedules C for petitioners' real estate and saddlebred horse activities. We find that Mr. Malone, like the C.P.A. in Price, does not qualify as a shared accountant.

[*31] The only other shared accountant was Mr. Judah, who manually prepared the books and records for JREG, Judah Construction, and Judah Saddlebreds. This overlap is not significant because Mr. Judah is also the owner of these entities. See id. at *39; Estate of Stangeland v. Commissioner, slip op. at 22. Thus, this factor favors respondent.

I. Shared Books and Records

Petitioners maintained separate books and records for each of their entities. Petitioners did not consolidate financials at yearend to present the financial statements of JREG, Judah Construction, and Judah Saddlebreds on a unitary basis. This factor favors respondent.

After weighing all the factors, we hold that Judah Saddlebreds was an activity distinct from JREG and Judah Construction. Petitioners claim they operated the saddlebred horse and real estate activities as a single undertaking. We think this was an afterthought and an attempt to qualify for the presumption under section 183(d). The two activities were completely unrelated aside from a common owner. The fact that Judah Saddlebreds also allowed petitioners to converse with potential real estate clients is not grounds for finding that the real estate and saddlebred horse activities constituted a single undertaking.

**[\*32]** III.  Section 183 Analysis

Having decided that petitioners' saddlebred horse and real estate activities were separate undertakings, we next address section 183(a).  Section 183(a) limits section 162 trade or business expense deductions a taxpayer may claim for expenses attributable to an activity not engaged in for profit.  If section 183 applies, taxpayers may not deduct such expenses to the extent they exceed income generated by the activity.  Sec. 183(b).

Taxpayers engage in an activity for profit when they entertain an actual and honest objective of making a profit.  Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), aff'd without published opinion, 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs.  Whether the requisite profit objective exists is determined by looking at all the surrounding facts and circumstances.  Keanini v. Commissioner, 94 T.C. at 46; sec. 1.183-2(b), Income Tax Regs.  We give greater weight to objective facts than to a taxpayer's mere statement of intent.  Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), aff'd, 792 F.2d 1256 (4th Cir. 1986); sec. 1.183-2(a), Income Tax Regs.  Evidence from years after the years in issue is relevant to the extent it creates inferences regarding the taxpayer's requisite profit objective in earlier years.  E.g., Foster v. Commissioner, T.C. Memo. 2012-207;

[*33] <u>Bronson v. Commissioner</u>, T.C. Memo. 2012-17, <u>aff'd</u>, 591 F. App'x 625 (9th Cir. 2015).

Section 1.183-2(b), Income Tax Regs., provides a list of factors to consider in evaluating a taxpayer's profit objective, such as: (1) the manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his or her advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits earned, if any; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation were involved. No single factor controls. <u>Golanty v. Commissioner</u>, 72 T.C. 411, 426 (1979), <u>aff'd without published opinion</u>, 647 F.2d 170 (9th Cir. 1981). After careful consideration of these factors, we find that petitioners did not engage in their saddlebred horse activity with an objective of making a profit. Our analysis follows.

A. <u>Manner in Which the Taxpayer Carries On the Activity</u>

The fact that the taxpayer carries on an activity in a businesslike manner may indicate a profit motive. Sec. 1.183-2(b)(1), Income Tax Regs. This

[*34] determination requires consideration of: (a) whether the taxpayer maintained complete and accurate books and records for the activity; (b) whether the taxpayer conducted the activity in a manner substantially similar to comparable activities that were profitable; (c) whether the taxpayer changed operating procedures, adopted new techniques, or abandoned unprofitable methods in a manner consistent with an intent to improve profitability; (d) the preparation of a business plan; and (e) in the case of horse breeding and sales, a consistent and concentrated advertising program. Mathis v. Commissioner, T.C. Memo. 2013-294; Bronson v. Commissioner, T.C. Memo. 2012-17; Bettis v. Commissioner, T.C. Memo. 2010-164, 2010 WL 2990300.

### 1. Books and Records

We first address whether petitioners maintained complete and accurate books and records. Under this factor we consider whether the books and records were maintained with the objective of making a profit, not merely whether the taxpayer maintained books and records for tax purposes. Betts v. Commissioner, T.C. Memo. 2010-164. A taxpayer must maintain books and records for the purpose of cutting expenses, increasing profits, and evaluating the overall performance of the operation to satisfy this factor. Id.

**[*35]** In <u>Betts</u>, we addressed whether a taxpayer maintained accurate books and records in her horse business. In that case, the taxpayer maintained "a separate checking account, used business cards, kept an Excel spreadsheet of her income and expenses, and kept a file for each horse." <u>Id.</u>, 2010 WL 2990300, at *6. However, the taxpayer did not track direct and indirect expenses for each individual horse. Consequently, the taxpayer was unable to determine net profit after each sale because the costs of feeding, training, and other incidental expenses in running a horse business were not factored into the bottom line. <u>Id.</u> In holding that this factor weighed against the taxpayer we said: "Without such knowledge, * * * [the taxpayer] could not have known how profitable the entire operation was." <u>Id.</u>

Petitioners' accounting records are even less detailed than those of the taxpayer in <u>Betts</u>. Petitioners' records were merely crude, handwritten compilations of receipts, invoices, and bank account information. Still, petitioners contend that they would "review the yearly information to identify cost-reducing strategies." We do not see how that was possible after viewing petitioners' accounting records. It appears that no review of the books and records took place outside of compiling them for tax purposes. Furthermore, petitioners did not keep

**[*36]** contemporaneous books and records for each horse, making it impossible to improve the financial condition of the activity.

Moreover, petitioners' accounting records in their real estate activities are significantly different from those in their saddlebred horse activity. We think the difference exists because the former was operated to earn a profit. Both petitioners are seasoned business professionals who understand the importance of financial records in relation to running a profitable business. Indeed, Mr. Judah maintains itemized records for each of his real estate developments and tracks their ongoing profitability. During the years at issue petitioners tracked expenses and revenues for each property. JREG also maintained detailed general ledgers that were used to prepare balance sheets, income statements, and other financial information that a business person would commonly need to assess profitability. In comparison, petitioners maintained sparse accounting records for Judah Saddlebreds and never produced financial statements for the activity.

Consequently, we hold that petitioners did not maintain books and records to cut expenses and earn a profit. We think that petitioners kept receipts for tax purposes and compiled their records only for their tax accountant's use. This factor favors respondent.

**[*37]**      2. Comparable Activities

The next factor is whether petitioners conducted their saddlebred horse activity in a manner similar to comparable activities that were profitable. Petitioners have never actively engaged in any horse-related business other than the saddlebred horse activity at issue. This factor is neutral.

3. Changing Operating Tactics To Improve Profitability

We next consider whether petitioners changed operating procedures, cut expenses, or abandoned unprofitable lines of business. Petitioners argue that they began to cut expenses after 2010 and this factor should weigh in their favor. Specifically, petitioners contend that they changed their advertisement methodology in an attempt to cut expenses. We disagree.

Petitioners' operating expenses increased exponentially from 1998 through 2010. Petitioners failed to realize greater revenue and profit from their saddlebred horse activity despite a surge in operating expenses from 1998 to 2010. Moreover, without adequate books and records, petitioners could not abandon unprofitable lines of business. Simply decreasing their advertising expenses, without more, is not sufficient to satisfy this factor.

Showing and training horses was petitioners' largest expense. Petitioners made no efforts to reduce these expenses by putting their horses out to pasture in

[*38] the winter. When a horse is put out to pasture, expenses drastically diminish because the horse is not being trained. Petitioners did not offer any evidence as to why they did not put their horses out to pasture; but it was likely that Ali showed horses throughout the year and petitioners did not want to interfere with their daughter's training.

Notably, petitioners' show expenses decreased drastically after 2010. This decrease coincided with Ali's attendance at veterinary school. Thus, it seems that petitioners cut their largest expense because Ali was no longer showing horses, and petitioners no longer needed to incur the costs of promoting their daughter's saddlebred horse career. Therefore, on the basis of all the above facts and circumstances this factor favors respondent.

4. Business Plan

Petitioners contend that Judah Saddlebreds' mission statement constituted a valid business plan. We disagree. According to the Mission Statement, "[t]he mission of Judah Saddlebreds is to locate and acquire quality horses, which through proper training, successful performance, and potential breeding will both enhance the value of the breed and return a substantial profit to the business." Petitioners' business plan is completely "devoid of any meaningful financial analysis". See Betts v. Commissioner, 2010 WL 2990300, at *6. In Betts, the

**[*39]** taxpayer testified that her business plan was to "purchase prospective sport horses that needed developing, some training, and resell them at a much higher price to the amateur and young rider market." Id. at *4. Petitioners' business plan mirrors that of the taxpayer in Betts, and we held that this factor weighed against the taxpayer in that case because of the taxpayer's failure to "prepare any business or profit plans, profit or loss statements, balance sheets, or financial break-even analyses" for her horse business. Id. at *6 (quoting Dodge v. Commissioner, T.C. Memo. 1998-89, aff'd without published opinion, 188 F.3d 507 (6th Cir. 1999)). Nonetheless, the taxpayer in Betts did maintain contemporaneous books and records that reflected her ongoing business operations.

Here, petitioners did not even maintain an ongoing compilation of income or expenses; instead, they kept a compilation of receipts which they used to prepare an income and expense statement at yearend. Consequently, petitioners could not take financial information into account until after the taxable year was over, much less before they began a new year of operations. Given petitioners' conduct in other for-profit activities (the business proposal with the Fisher Family Trust, for example), we would expect Judah Saddlebreds to have some kind of market analysis, budget, or cashflow projections prepared before commencing the saddlebred horse activity. Yet petitioners entered into the activity with nothing

**[*40]** more than a plan to sell horses for more than they paid for them. This is not a business plan and is devoid of any meaningful financial analysis. Therefore, this factor weighs against petitioners.

### 5. Advertising

Petitioners argue they advertised their horses in a manner consistent with operating a for-profit business in the saddlebred horse industry. We agree and have held that "advertising at horse shows, by word of mouth, in print media, and by participation in horse shows may indicate an intent to make a profit". Id. at *7 (citing Engdahl v. Commissioner, 72 T.C. 659, 667 (1979)). Petitioners advertised their horses mainly by participating in horse shows. Petitioners also advertised through online and print media. Although these advertisements helped promote their daughter as an amateur rider, they also helped promote petitioners' saddlebred horse activity. This factor favors petitioners.

In conclusion, we find that petitioners did not carry on Judah Saddlebreds in a manner consistent with an activity engaged in for profit. Instead, petitioners' lack of financial planning, failure to maintain adequate books and records, and continued losses without modifying their business operations indicate that they lacked an objective of earning profit.

**[*41]** B.  <u>Expertise of the Taxpayer</u>

"The taxpayer's expertise, research, and extensive study of an activity, as well as his or her consultation with experts, may indicate a profit motive."  <u>Mathis v. Commissioner</u>, at *10; sec. 1.183-2(b)(2), Income Tax Regs.  This factor focuses on "whether petitioner[s] received advice from the experts as to the accepted principles and economics of profitably running a business and not merely the general advice that a horse enthusiast would seek in training and showing horses as a hobby."  <u>Betts v. Commissioner</u>, 2010 WL 2990300, at *8 (citing <u>Golanty v. Commissioner</u>, 72 T.C. 411).

Petitioners argue that they sought business advice from their C.P.A. However, Mr. Malone simply advised petitioners to acquire horses and sell them for a profit.  Petitioners also assert that Mr. Malone instructed them to form an LLC.  These simple instructions form the basis of petitioners' argument that Mr. Malone was an expert consultant.  We disagree.

Mr. Malone's advice to sell horses for more than petitioners paid for them is not expert advice by any means.  Petitioners did not gain any insight from that advice, especially considering their business background, education, and success in other business endeavors.  Petitioners did not seek the type of expert financial advice or services that a C.P.A. commonly provides.  Mr. Malone maintained

[*42] accounting records and prepared monthly financial statements for other clients. In contrast, Mr. Malone did not provide petitioners the same services because petitioners never asked for them. Mr. Malone never advised petitioners on what the sale prices of the saddle horses should be to recoup operating expenses or what lines of business could improve profitability and reduce expenses. Most importantly, petitioners never sought any type of advice on turning Judah Saddlebreds into a profitable business. Mr. Malone only assisted with the formation of Judah Saddlebreds, and from that point forward he prepared petitioners' income tax returns. This does not constitute expert advice in "profitably running a business." See id.

Petitioners further contend that they sought expert advice from their trainers. Petitioners consulted with their trainers when deciding what shows to enter and what events provided the best chance of success. Petitioners also consulted with their trainers to determine the selling price of a horse. Respondent contends that petitioners' trainers never had access to petitioners' books and records and therefore could not provide reliable advice on the price at which petitioners needed to sell a given horse for a profit. We disagree with respondent on this point. Petitioners' trainers knew what a reasonable sale price would be given the market and the background of the horse. Petitioners' seeking advice on

[*43] what shows to enter and what events to compete in does not amount to seeking expert advice on profitability because they sought "merely the general advice that a horse enthusiast would seek in training and showing horses as a hobby." See Betts v. Commissioner, 2010 WL 2990300, at *8. However, seeking advice as to how much to sell a horse for is something different. The trainers were the most knowledgeable individuals to gauge the market price for a given horse, especially when considering the unique characteristics that added value to petitioners' horses. On balance we find that this factor favors petitioners, but only because they consulted with trainers before selling their horses.

### C. Time and Effort Allocated to Activity

The taxpayer's devotion of much of his or her personal time and effort to carrying on an activity may indicate a profit motive, particularly if the activity does not involve substantial personal or recreational aspects. Sec. 1.183-2(b)(3), Income Tax Regs. The time and effort spent on an activity that has substantial personal and recreational aspects may be due to a taxpayer's enjoyment of the activity rather than the taxpayer's objective of making a profit. Rinehart v. Commissioner, T.C. Memo. 1998-205.

We find that petitioners did not allocate the necessary time or effort to establish that they had the requisite objective of making a profit. Petitioners' time

[*44] and effort consisted of visiting their horses twice a week, speaking with their trainers, preparing for shows, paying invoices, and maintaining books and records. Yet petitioners mainly spent their time attending horse shows or horse-related events while engaging in their saddlebred horse activity. Approximately 10 to 15 hours per week was allocated to these types of activities according to petitioners. Understandably, petitioners worked full-time jobs, thereby limiting the time they could allocate to the saddlebred horse activity. We have previously found that maintaining a full-time job in addition to conducting a purported business can be a "positive factor reflecting * * * [the taxpayer's] motivation" to earn a profit. Dickson v. Commissioner, T.C. Memo. 1986-182, 1986 Tax Ct. Memo LEXIS 423, at *11.

Petitioners allocated time mainly to the enjoyable aspects of their saddlebred horse activity. Testimony established that petitioners did not clean the horse stables, feed or groom the horses, or perform any strenuous labor commonly associated with running a horse business. Instead, petitioners gained considerable pleasure by watching their daughter compete in horse shows. In addition, petitioners enjoyed socializing at horse shows, and participating in the saddlebred horse business carries a certain amount of prestige. Therefore, we find that the limited amount of time allocated to their saddlebred horse activity and the

[*45] substantial elements of personal pleasure weigh against petitioners. See Mathis v. Commissioner, T.C. Memo. 2013-294 (noting that even though the taxpayer spent over 40 hours a week in relation to her horse business, the fact that she gained substantial personal pleasure from the activity limited the overall impact of this factor in supporting the taxpayer's claim to be conducting the horse business for profit).

D. The Expectation That Assets Used in the Activity May Appreciate in Value

An expectation that assets used in the activity will appreciate in value may indicate a profit motive even if the taxpayer derives no profit from current operations. Sec. 1.183-2(b)(4), Income Tax Regs. However, we may infer a profit objective from such expected appreciation only when the appreciation exceeds operating expenses and would be sufficient to recoup the accumulated losses of prior years. Foster v. Commissioner, T.C. Memo. 2012-207; see Golanty v. Commissioner, 72 T.C. at 427-428.

Petitioners argue that some of their horses were sold for more than their initial costs. Although this may be true, the proper inquiry is whether the appreciation of petitioners' assets is sufficient to recoup the accumulated losses of prior years. See Foster v. Commissioner, T.C. Memo. 2012-207. Overcoming this

[*46] hurdle seems improbable for petitioners given reported losses for every year of operation. Indeed, Judah Saddlebreds has accumulated over $1.5 million in losses, including depreciation expenses on petitioners' horses.

According to petitioners, they have realized a net profit of $142,000 since 1998. Petitioners would have us disregard basic accounting principles and ignore Judah Saddlebreds' considerable operating expenses if we were to accept that claim as true, and we fail to see how petitioners realized any profit in regard to the saddlebred horse activity. Moreover, even if this were true, $142,000 of profit falls drastically short of recouping $1.5 million in accumulated losses. Most importantly, petitioners concede that they will never generate enough profit to recoup the $1.5 million in losses. Nonetheless, they argue that we should ignore their inability to recoup past losses and look only to the prospective potential of Judah Saddlebreds' profitability. However, on the basis of previously decided cases, we must consider petitioners' ability to recoup accumulated losses. See Price v. Commissioner, T.C. Memo. 2014-253; Foster v. Commissioner, T.C. Memo. 2012-207. Thus, this factor favors respondent.

E. Success of Taxpayer in Carrying on Other Related Businesses

Section 1.183-2(b)(5), Income Tax Regs., provides: "The fact that the taxpayer has engaged in similar activities in the past and converted them from

[*47] unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable." None of petitioners' past activities provides evidence of a profit motive here because petitioners have never actively engaged in other horse-related activities. Therefore, this factor is neutral.

F. The Taxpayer's History of Income or Loss With Respect to the Activity

A history of continued losses with respect to an activity may indicate that the taxpayer lacked a profit motive. See id. subpara. (6). Although a series of losses during the initial or startup stage of an activity may not necessarily indicate a lack of profit motive, a record of large losses over many years is persuasive evidence that the taxpayer did not have such a motive. Golanty v. Commissioner, 72 T.C. at 426; Foster v. Commissioner, T.C. Memo. 2012-207.

Petitioners recognized losses only in the saddlebred horse activity. We have previously held that the start-up phase for a horse breeding activity is 5 to 10 years. Price v. Commissioner, T.C. Memo. 2014-253, at *69 (citing Engdahl v. Commissioner, 72 T.C. at 669). Petitioners have been in the saddlebred horse activity for over 10 years and have not generated a profit. Moreover, respondent is not challenging the first 9 years of petitioner's saddlebred horse activity, only the 11th, 12th and 13th years. We fail to understand why petitioners have continued

[*48] to generate losses, given that the startup phase is approximately 5 to 10 years. Petitioners contend that they could generate a profit if they successfully bred one of their horses. However, petitioners did breed saddlebred horses and they still did not generate a profit. Furthermore, we cannot find for petitioners on what may happen, and mere speculation will not carry the day.

Petitioners further argue that Judah Saddlebreds' losses have decreased in recent years. In Mathis v. Commissioner, at *15, the taxpayers "cite[d] the diminishing losses as a sign that the [horse] farm is nearing profitability." We rejected that argument because "the smaller net losses did not result from increased sales, only from lower reported expenses". Id. at *15-*16. Like the losses of the taxpayers in Mathis, petitioners' losses were the result of decreased expenditures after 2010. Increasing profits had nothing to do with it. Furthermore, petitioners' opening brief states that "[a]lthough * * * [we] may not be able to fully recoup * * * [our] start-up losses, * * * [we] could generate sufficient profit going forward to recoup several years of post-start-up losses". We have squarely rejected that argument and held "[t]he current and expected losses of an activity should not be of such a magnitude that an overall profit going forward would not be possible." Id. at *16 (citing Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), aff'd, 379 F.2d 252 (2d Cir. 1967)). Petitioners did not

**[\*49]** present convincing evidence that future profits could possibly offset the accumulated losses of $1.5 million. Thus, this factor favors respondent.

### G. The Amount of Occasional Profits Earned

The amounts of profits in relation to the amount of losses incurred may provide evidence of the taxpayer's intent. Sec. 1.183-2(b)(7), Income Tax Regs. Petitioners have never generated a profit from their saddlebred horse activity and continue to operate Judah Saddlebreds. In turn, this indicates that petitioners are engaged in the saddlebred horse activity to promote their daughter as a show woman. There would be no other reason to continue to run an unprofitable venture since 1998 unless there was some ulterior motive. This factor favors respondent.

### H. The Financial Status of the Taxpayer

Substantial income from sources other than the activity may indicate that the activity is not engaged in for profit. Id. subpara. (8). A taxpayer with substantial income unrelated to the activity can more readily afford a hobby. Foster v. Commissioner, T.C. Memo. 2012-207. This is particularly true if the losses from the activity might generate substantial tax benefits. Golanty v. Commissioner, 72 T.C. at 429.

[*50] Petitioners have substantial sources of income apart from the saddlebred horse activity. Mr. Judah generates substantial self-employment income from his real estate activities, and Mrs. Judah earns a considerable salary as the chief operating officer of a large real estate development company. Hence, petitioners were able to offset that income with recurring losses from Judah Saddlebreds. Thus, petitioners had substantial income from other sources and gained substantial tax benefits from the losses generated by Judah Saddlebreds. See id.

Petitioners argue that there is no benefit from engaging in an activity that loses money. Petitioners would have likely incurred these expenses anyway, albeit probably not to the same degree, because they wanted to promote their daughter's saddlebred horse hobby. The test is whether petitioners intended to earn a profit, and in the present case petitioners' intention to earn a profit was secondary to Ali's saddlebred horse hobby. This factor favors respondent.

I. <u>Whether Elements of Personal Pleasure or Recreation Are Involved</u>

The presence of personal motives and recreational elements in carrying on an activity may indicate that the activity is not engaged in for profit. Sec. 1.183-2(b)(9), Income Tax Regs. The saddlebred horse activity provides substantial personal pleasure to petitioners. As stated previously, petitioners do not engage in any of the rigorous aspects of the saddlebred horse activity such as mucking out

[*51] stalls, grooming, or feeding horses. Rather, petitioners' activity provides a social outlet with friends. Most importantly, it allows them to watch their daughter engage in her passion, and petitioners gain substantial enjoyment seeing their daughter ride horses.

In Mathis v. Commissioner, T.C. Memo. 2013-294, we addressed this factor for a taxpayer who enjoyed watching horses, brought horses to her ranch for personal pleasure, and exhibited horses with her daughter. The taxpayer worked between 40 and 60 hours a week in relation to her horse business. Id. at *4. We held that "running a large-scale breeding operation takes many hours of hard work, and * * * [the taxpayer] has sacrificed family and personal time to promote her horses." Id. at *18-*19. Unlike the taxpayer in Mathis, petitioners did not sacrifice personal or family time in order to engage in the saddlebred horse activity. Alternatively, petitioners' saddlebred horse activity promoted and supplemented the time that they spent with each other, their daughter, and their friends. Therefore, this factors favors respondent.

[*52] In conclusion, we hold that petitioners did not engage in the saddlebred horse activity to earn a profit. Petitioners' primary concern was promoting their daughter's natural talents, and any intent to earn a profit was secondary.[5]

IV. Accuracy-Related Penalties

Respondent determined that petitioners were liable for an accuracy-related penalty pursuant to section 6662(a) for each of the tax years at issue. Section 6662(a) and (b)(1) and (2) imposes a penalty of 20% on any underpayment attributable to, among other things, (1) negligence or disregard of rules or regulations or (2) any substantial understatement of income tax. An understatement is substantial if it exceeds the greater of $5,000 or 10% of the income tax required to be shown on the return for the taxable year. Sec. 6662(d)(1)(A).

Respondent bears the burden of production with respect to this penalty. See sec. 7491(c). Respondent satisfies the burden by presenting sufficient evidence supporting the penalty. See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Respondent determined understatements of petitioners' income tax of $55,328,

_____

[5]Because we hold that petitioners did not engage in their saddlebred horse activity for profit, we do not address additional issues raised by the parties under secs. 469 and 1231. Both sections require income to be from a "trade or business". Petitioners did not operate a trade or business in regard to the saddlebred horse activity and therefore the issues raised under secs. 469 and 1231 are moot.

**[\*53]** $49,512.15, and $32,049 for the years 2008, 2009, and 2010, respectively.

These amounts exceed 10% of the tax required to be shown on the respective

returns, which for each year exceeds $5,000. Petitioners also satisfy the 10%

income tax test as well.[6] Thus, respondent has carried his burden of demonstrating

that petitioners substantially understated their income tax for each year at issue.

Pursuant to section 6664(c)(1), the accuracy-related penalty under section

6662 does not apply to any portion of an underpayment for which a taxpayer

establishes that he or she: (1) had reasonable cause and (2) acted in good faith. A

taxpayer's failure to comply with section 183 does not preclude a reasonable cause

and good faith defense. See, e.g., Rodriguez v. Commissioner, T.C. Memo.

2013-221, at \*57. For a taxpayer to rely reasonably upon advice so as possibly to

negate a section 6662(a) accuracy-related penalty determined by the

Commissioner, the taxpayer must prove by a preponderance of the evidence that

the taxpayer meets each requirement of the following three-prong test: (1) the

adviser was a competent professional who had sufficient expertise to justify

reliance, (2) the taxpayer provided necessary and accurate information to the

---

[6]Petitioners' correct income tax is $67,786, $141,015, and $74,081 for the taxable years 2008, 2009, and 2010, respectively. Ten percent of the income tax owed is $6,779, $14,102, and $7,408 for the taxable years 2008, 2009, and 2010, respectively.

**[\*54]** adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment.  Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).  Whether a taxpayer has acted with reasonable cause and in good faith depends on the facts and circumstances of the case.

Petitioners hired a C.P.A. to prepare their income tax return for each of the years at issue.  Mr. Malone was petitioners' C.P.A. from 1998 to 2007, but he did not sign petitioners' returns for the years at issue on account of his retirement in 2008.  However, Mr. Malone believed petitioners conducted their saddlebred horse activity in a businesslike manner and therefore instructed petitioners to deduct the saddlebred horse activity expenses on their income tax returns.

During the years at issue, a C.P.A. from Mr. Malone's old firm prepared petitioners' income tax returns.  Accordingly, we think said C.P.A. would have been of the same opinion as Mr. Malone in that petitioners' saddlebred horse activity was not subject to the hobby loss rules of section 183.  At all times, petitioners submitted complete and accurate records to their C.P.A. to substantiate the business expenses and relied on their C.P.A. to properly prepare the returns. Thus, the three-prong test of Neonatology Assocs. is satisfied.

**[\*55]** To reflect the foregoing,

<u>Decision will be entered for respondent as to the deficiencies and for petitioners as to the accuracy-related penalties under section 6662(a).</u>